**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dominic CARZOLI, Defendant-Appellant.**

**No. 18562.**

United States Court of Appeals,
Seventh Circuit.

July 9, 1971.

As Amended on Denial of Rehearing
Sept. 2, 1971.

Julius Lucius Echeles, Chicago, Ill., for defendant-appellant.

William J. Bauer, U. S. Atty., Steven J. Kadison, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Michael D. Marrs, Asst. U. S. Attys., of counsel.

Before KNOCH, Senior Circuit Judge, and CUMMINGS and PELL, Circuit Judges.

KNOCH, Senior Circuit Judge.

Dominic Carzoli, defendant-appellant, was convicted in a jury trial on a charge of wilfully endeavoring to obstruct communication of information by intimidation and threats in violation of Title 18, U.S.C., § 1510. He was sentenced to serve three years. This appeal followed. Although there was virtual agreement on the actual words spoken by the defendant, there were some sharp conflicts

in the testimony at the trial presenting factual issues for determination by the jury.

The defendant asserts that the evidence was insufficient to prove the allegations of the indictment because he had no intent to utter a threat and his words were not considered a threat by the witness to whom they were addressed, and, further, that there was no proof the alleged threats prevented communication of information relative to a criminal offense. He also contends he was erroneously limited in his right to cross-examine, that his Fifth Amendment right to remain silent was the subject of unfair government comment, and that he was denied *Miranda* warnings. He alleges other errors at his trial included improper argument to the jury and misuse of an impeaching affidavit.

There was evidence from which the jury could have decided that Thomas J. Knitter, then a special agent with the Internal Revenue Service, was engaged in investigation of a possible criminal violation of the Internal Revenue Laws by defendant or one Vera Sanders. He was particularly trying to ascertain the person responsible for reporting the income of a concern called Gildom Cleaners in Chicago, Illinois.

Agent Knitter and Agent Thomas Isitoro (also of the Internal Revenue Service) had spoken to defendant at his home in July 1968, (warning him at that time of his constitutional rights) with respect to his tax liability for 1964–1966. Defendant had denied receiving income from Gildom Cleaners. Agent Knitter had spoken to defendant on subsequent occasions about his income.

Agent Knitter had met Betty Smith, who was an employee of Gildom Cleaners, and, on January 22, 1969, in the company of Special Agent Kevin Nestor, he had a conversation with Mrs. Smith and defendant at Gildom Cleaners. In answer to Agent Knitter's inquiry Mrs. Smith had said she left Agent Knitter's message for Vera Sanders, later found it gone and assumed it had been received.

Agent Knitter then asked defendant if he knew where Vera Sanders was living and defendant said he did, but would not tell it to the Agents. When Mrs. Smith was asked the same question her answer was interrupted by defendant who raised his voice and said: "Betty, shut up. Don't tell them anything or you will end up in the trunk of a car." When Agent Knitter told Mrs. Smith she could be called as a witness, defendant said: "You had better not remember anything. You don't know anything about Sanders or the business. You only work at the cleaners. Don't tell the Agents anything else." Agent Knitter said Mrs. Smith's face became flushed, she stepped back, looked from one to the other of the three men and said "I know that I can end up in the trunk of a car for giving information to the government."

At the trial, Mrs. Smith testified for the defense that she understood defendant's remarks to be humorously intended, that she had asked "Where are you going to find a trunk big enough?" and everybody had laughed.

Mrs. Smith's 18-year-old son, Eugene, also testified that he was present at the time and that his mother's reaction to defendant's words were first amazement and then laughter. The two agents testified that they did not see Eugene Smith in the Gildom Cleaners on the date in question although Agent Knitter had gone through the premises to look at the back door. Agent Knitter described the interior of the premises in which the incident took place as approximately 15 by 30 feet. He said that if the son had been where he testified he was standing, he would have been directly across the counter from Agent Knitter. Mrs. Smith said that when she later responded to a subpoena at the Federal Building she told Assistant U. S. Attorney Sheldon Davidson, in the presence of Agents Knitter and Nestor, that the incident at the Cleaners on January 22, 1969, was all a joke.

On cross-examination she was asked about an affidavit she signed in May 1969 in which she said her stomach

had turned over and her heart was pounding after hearing the defendant's words. She was also asked whether she had not said in the affidavit that she thought it was stupid for him to say this before the agents, that he must mean it as a joke and she made some light remark about getting a trunk large enough, but she had also said in her affidavit that she left the store right after the agents did and never returned, that she was frightened then and still, that she refused to answer questions and would not testify in Court because of defendant's statement, that she feared for her own life and the lives of her family. At the trial Mrs. Smith said that although she had signed the affidavit she had not read all of it and that it was not all correct, that she had not meant that she was really frightened because of defendant's statement. She also testified on cross-examination that when she had testified to the Grand Jury on January 30, 1969, she had given only her name, answering "I don't remember" to all other questions, and on February 6, 1969, had taken the Fifth Amendment in response to all questions. We do not agree with defendant that it was necessary to show what questions were put to Mrs. Smith to negative the possibility that she refused to answer not out of fear but to avoid incriminating herself. When she came out of the Grand Jury room on January 30, 1969 she had said to Agent Knitter, "I always thought that I was patriotic. * * * Now I am called before a Federal Grand Jury and I can't help. * * * I just can't give him the answers."

As indicated, Agents Knitter and Nestor were present at the conversation between Mrs. Smith and Mr. Davidson. They testified to her statements that she had been frightened and was still frightened. They testified that her answers to Mr. Davidson's questions were incorporated in the affidavit she later signed. Agent Nestor testified that Mrs. Smith read the affidavit in his presence, that she said she did not want to sign it be-cause there were certain items which she did not believe were true or were out of context. He said he instructed her to go ahead and change anything she wanted to. Mrs. Smith had also testified that she told the Agents there were certain things in the statement she did not agree with and she was told she could change any of the wording, but she had signed it without making any changes.

Special Agent Robert R. Fuesel testified that when Mrs. Smith signed the affidavit in his presence and Agent Nestor's, she told him she was fearful for her life and her husband's and children's lives and did not want to become involved, that she had attempted to move away from her present location but was unable to get an apartment. Mrs. Smith denied making any such statements.

The government argues persuasively that whether or not a victim feels threatened is immaterial to a prosecution under this statute (Title 18, U.S.C. § 1510) which is violated by a wilful endeavor, by means of intimidation or force, or threats thereof, to obstruct the communication of information (relating to a violation of any criminal statute of the United States) by any person to a criminal investigator. The Legislative History (U. S. Code Congressional and Administrative News, 90th Congress, First Session, 1967, p. 1760 et seq.) supports the government view. The purpose of this statute is stated as:

"* * * to plug a loophole in the protection the Government can now provide to its own witnesses and informants. This loophole results from the fact that presently it is not a Federal crime to harass, intimidate, or assault a witness who may communicate information to Federal investigators prior to a case reaching the court.

\* \* \* \* \* \*

"This frustration of criminal investigations and prosecutions should no longer be tolerated, but since there is no statute which presently protects

witnesses during the investigative stage, there is need for the enactment of this legislation."

with respect to the meaning of the word "endeavor" we find:

"This act also uses the word 'endeavors.' Here 'endeavor' means any effort or essay to accomplish the evil purpose that this act is designed to prevent. The use of the word 'endeavor' avoids the technical difficulties which would be involved by the use of the word 'attempt.' Thus, where a person's acts have not progressed far enough to amount to an attempt, under the act such acts would come within the scope of the word 'endeavor' and thus be subject to punishment."

■ This supports the argument that success in the endeavor is not an element of the offense.

In the sole case which we have come across construing this statute, United States v. Kozak, 3 Cir., 1971, 438 F.2d 1062, actual force was charged in the second count of a two-count indictment. The two defendants were charged in the first count with wilful endeavor to use force to delay and prevent communication of information. One of the defendants was found guilty on the first count and not guilty on the second. He argued that the verdict could not stand for inconsistency. The Third Circuit held (p. 1068) that the endeavor and actual use of force were separable, citing Knight v. United States, 5 Cir., 1962, 310 F.2d 305, 307, for the proposition that success or failure of the endeavor was immaterial. *Knight* dealt with Title 18, U.S.C. § 1503, endeavoring to influence, intimidate, or impede a witness in a United States Court, before a United States Commissioner or committing Magistrate.

As the statute under which defendant was convicted Title 18 U.S.C. § 1510 is comparatively new (November 3, 1967), the defendant draws analogies from other statutes involving threats. For example, he cites Marshall v. United States, 9 Cir. 1966, 355 F.2d 999, 1010, which involved conspiracy to travel in interstate commerce with intent to carry on and facilitate extortion. The Court there referred to its decision in Carbo v. United States, 1963, 314 F.2d 718, 740–741, cert. den. Palermo v. United States, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498, where it was said that to prove a substantive act of extortion it was essential to show generation of fear in the victim and to prove a substantive act of attempted extortion it was necessary to prove an attempt to instill fear. The court found no error in admission of evidence as to the victim's "subjective emotional feelings."

United States v. Kennedy, 2 Cir., 1961, 291 F.2d 457, 458, involved the Hobbs Act. Defendants were charged with obstructing interstate commerce by extortion. In that case, the Court said that proof of the state of mind of the victim was relevant to a prosecution for extortion and might be evidenced by the victim's own testimony at the trial.

Defendant argues that whether the words said were or were not uttered in jest without criminal intent can best be determined by the recipient of the alleged threat. Hence he sees it most important to show Mrs. Smith's state of mind and points to what she said about her reaction as the best evidence of that fact. Of course, her reactions in so far as they were visible were also described by the agent witnesses. The jury saw and heard Mrs. Smith and made its own determination of her credibility.

In this Court, the government has stressed its view that proof of the success of the threat is not an element of the offense, and that the government was improperly obliged to overprove its case. At the trial the jury was instructed at defendant's request and without objection:

"You are hereby instructed that if the words spoken by the Defendant were made in jest and were not considered by Betty Smith as having induced fear in her or as having intimi-

dated or threatened her, then you should find the Defendant not guilty. "Before you may find the Defendant guilty, you must find that the words uttered by him to Betty Smith on January 22, 1969, did actually induce fear on her part and that such words uttered by Defendant were considered by her to be intimidation and a threat of force."

In oral argument, government counsel attributed the absence of objection to the fact that this was one of the first cases under this new statute.

■ The jury apparently decided that the words of the defendant were not uttered in jest, did induce fear and were considered by Mrs. Smith to be intimidation and a threat of force. There was ample evidence to support that conclusion in the testimony of the agents who described Mrs. Smith's appearance and her actions over a period of time during which they had several occasions to observe her. The jurors were not obliged to believe Mrs. Smith's own testimony at the trial.

■ In the course of the trial defendant several times asked for voir dire hearing to ascertain whether he had been properly warned of his rights pursuant to the holding in Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Trial Judge did hold such a hearing at the conclusion of the government's case in chief and decided adversely to defendant. At that time defendant said he had been warned of his rights earlier on July 12, 1968 but not on January 22, 1969, contrary to the testimony of Agents Knitter and Nestor at the trial who had both said he was again told of his rights on January 22, 1969. We find no error in the Trial Judge's ruling.

In addition the government reminds us that United States v. Dickerson, 7 Cir., 1969, 413 F.2d 1111, holding *Miranda* applicable to criminal investigation of Internal Revenue violations, was made effective prospectively only. That decision was handed down July 28, 1969.

The incident with which we are concerned occurred on January 22, 1969, and did not involve a custodial interrogation. Defendant was not being questioned in an Internal Revenue Office. His freedom was in no way limited.

■ Defendant's refusal to answer a question, as reported in the testimony of the agents, did not involve assertion of a Fifth Amendment privilege against self-incrimination. He was not discussing his own affairs. He had just said he knew where Vera Sanders lived. He then refused to tell the agents where. It was only afterwards that Mrs. Smith was asked that question.

An element of the offense charged is an actual, existing investigation of possible violation of a criminal statute. It was necessary for the government to show the circumstances under which communication of information was sought to be obstructed. The jurors, however, were instructed that the fact of defendant's own involvement in an investigation was not to be considered in determining whether he was or was not guilty of endeavoring to obstruct communication of information.

The government further notes that defendant's objections, at the time, to the testimony in which his refusal to answer a question was mentioned concerned the issue of warnings alone and argued that he is now precluded from raising this new point on appeal. The government cites a long line of authority for this view, with which we have no quarrel. Nevertheless we have considered the defendant's argument but find no such impropriety as he sees in the testimony about his refusal to tell the agents where Vera Sanders resided.

In the course of cross-examination of Agent Knitter, defense counsel sought to elicit evidence of occurrences after January 22, 1969, apparently to bring out in advance evidence to support the defense which defendant would later develop when presenting his own evidence that Mrs. Smith had subsequently said she regarded defendant's statement as a

joke. The Trial Judge sustained objection on the ground counsel was proceeding beyond the scope of the direct examination, pointing out that the witness would be available for later call as a witness for the defense. The Trial Judge reminded the defendant of that ruling when he sustained similar objections to later cross-examination of Agent Nestor. Defendant did not, however, elect to call these agents as his witnesses. Defendant states he also wanted to inquire whether further questions had been put to Mrs. Smith at a later date as bearing on the issue of preventing communication. This evidence could also have been elicited as part of defendant's case by calling the witness later, a it went beyond the bounds of direct examination.

■ It is the province of the Trial Judge to exercise a wise discretion in determining whether, considering the direct examination, it is proper to allow or exclude specific questions on cross-examination. United States v. Keig, 7 Cir., 1964, 334 F.2d 823, 829, and cases there cited.

The defendant raises no objection to the basic principle but considers that the Trial Judge too narrowly construed the scope of the direct examination. We do not agree. We see no abuse of discretion.

Agent Nestor testified that Agent Knitter had told defendant, who asked whether he needed an attorney, that if there were nothing to hide and no guilt, it was up to defendant whether he wanted an attorney or not. Defendant sees serious error in sustaining objections on the ground of irrelevance to defense counsel's questions whether Internal Revenue Agents thought only the guilty needed lawyers and whether many persons whose tax returns were under investigation did not in fact have lawyers. Defendant contends he was seeking to take the "sting" out of what he views as an implication that defendant was shown to be guilty because he asked about retaining counsel. Like the Trial Judge we see no probative value in these questions.

It does not seem to us from a careful reading of the government's argument to the jury that the prosecutor, as defendant charges, exceeded the limits of the right to argue the facts and inferences properly drawn from the testimony. United States v. Cotter, 1 Cir., 1970, 425 F.2d 450, 452; Wakaksan v. United States, 8 Cir., 1966, 367 F.2d 639, 646, cert. den. 386 U.S. 994, 87 S. Ct. 1312, 18 L.Ed.2d 341.

■ The Court denied a motion for mistrial made after the prosecutor said he was sorry for Mrs. Smith, sorry "she had to come before this Court and commit perjury, which she did do." The Trial Judge admonished government counsel not to use the word "perjury". Counsel then said Mrs. Smith had not told the jury the truth. In Harris v. United States, 1968, 131 U.S.App.D.C. 105, 402 F.2d 656 on which defendant relies, the Court of Appeals held that it was permissible argument for the prosecution to attack the appellant's version of the events as an incredible tale. The Court, however, criticized as of questionable propriety despite absence of objection, counsel's further comments (although the Court did not view them as having had significant impact on the case which was affirmed, no "plain error" being found) because of frequent nonobservance of the prohibition against expression of personal opinions on the ultimate issue by counsel. The Court referred in a footnote (pp. 657–658) to the American Bar Association's Canons of Professional Ethics, Canon 22, which stated that it is not candid or fair for counsel in argument to assert as a fact what has not been proved and Canon 15, which provided that it was improper to assert in argument counsel's personal belief in his client's innocence or in the justice of his cause. In Harris, the Court thought the argument came disturbingly close to the prohibitions of Canon 15. The conviction was affirmed.

In Harris, the defendant's testimony could be considered the "lie" or "fabrication" which the prosecutor called it only if the jury not only refused to be-

lieve appellant's theory that a claimed third person intervened between the taking of the missing automobile and its coming into appellant's possession but also refused to believe that appellant had honestly forgotten the exact time of the events.

We do not think the prosecutor's statement here falls into the error of expressing a personal belief in the testimony, raising the spectre of a false issue of the credibility of counsel, deplored in Greenberg v. United States, 1 Cir., 1960, 280 F.2d 472, 474–475, (also cited by defendant) where the prosecutor told the jury he was "a sort of thirteenth juror."

It was clearly apparent that counsel was commenting on the evidence with no implication of personal knowledge apart from the evidence. Mrs. Smith's evidence was squarely contradicted by other witnesses and not merely impeached by her own affidavit.

■ The Trial Judge also overruled a motion for mistrial made after the prosecutor said that defendant could have threatened to murder anybody and then come and told the jury everybody was standing around laughing and it was not a threat. Defendant sees this as an insinuation, even raised in the hypothetical, that exceeds the bounds of propriety. However, the threat that one may wind up in the trunk of a car is clearly a death threat and the prosecutor was drawing permissible inferences from the words used. There was no misstatement of fact as in Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, where the prosecutor who was characterized as striking "foul" blows (p. 88, 55 S.Ct. 629 had misstated facts in cross-examination, put into the mouths of witnesses things they had not said and suggested statements were made to him personally out of court respecting which no proof was offered. (p. 84, 55 S.Ct. 629)

Defendant also contends that by failure to sustain defendant's objections to a reference to Mrs. Smith's affidavit, the jury was left with the mistaken impression that her out-of-court statements were effective not only to impeach her in-court testimony but to stand as affirmative evidence. Thus defendant argues he has been convicted in part on extrajudicial statements of a witness. The affidavit was not offered in evidence here.

When defendant objected that prosecuting counsel in closing argument was reading from an affidavit not in evidence, the Trial Judge ruled he was merely looking at it while relating the testimony as he had a right to do. The Court also instructed the jury that earlier statements (admissible only to impeach the credibility of a witness) do not establish the truth of the statements.

We have scrutinized all of the authorities to which our attention has been drawn by counsel on both sides. We are satisfied that the judgment of the District Court must be affirmed.

Affirmed.