James L. McBRIDE, Appellant,

v.

UNITED STATES, Appellee.

James I. THOMAS, Appellant,

v.

UNITED STATES, Appellee.

Richard L. SHEFFIELD, Appellant,

v.

UNITED STATES, Appellee.

Nos. 11839, 11850 and 12296.

District of Columbia Court of Appeals.

Argued May 4, 1978.

Decided Oct. 4, 1978.

---

Wallace E. Shipp, Jr., Washington, D. C., appointed by this court, for appellant in No. 11839.

John Mercer, Hyattsville, Md., appointed by this court, for appellant in No. 11850.

Thomas William Ullrich, Alexandria, Va., appointed by this court, for appellant in No. 12296.

F. Joseph Warin, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Frederick A. Douglas, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and FERREN, Associate Judges.

FERREN, Associate Judge:

James McBride, James Thomas, and Richard Sheffield appeal their convictions, after a joint jury trial, based on a robbery and shooting incident at the China Star Cafe in late January, 1976. Mr. McBride was convicted of assault with intent to kill while armed (D.C.Code 1973, §§ 22–501, –3202), assault with intent to rob while armed (D.C. Code 1973, §§ 22–501, –3202), and possession of a prohibited weapon (D.C.Code 1973, § 22–3214(b)). He maintains that the court erroneously admitted identification evidence produced by suggestive procedures, and that his motion for judgment of acquittal, based on insufficiency of the evidence, should have been granted. Mr. Thomas also was convicted of assault with intent to kill while armed and assault with intent to rob while armed. He asserts that official violation of the Interstate Agreement on Detainers mandates dismissal of the indictment, and that the evidence against him was insufficient for conviction. Mr. Sheffield, convicted of obstruction of justice (D.C.Code 1973, § 22–703), challenges the sufficiency of the evidence on that charge. We reject all assignments of error and therefore affirm all convictions.

I.

According to the government's evidence, all three appellants entered the China Star Cafe, near 17th and U Streets, N.W., late in the evening of January 21, 1976 (or early in the morning of January 22). Eyewitnesses testified that appellant McBride approached the owner of the cafe with a shotgun, told him it was a robbery, then shot him when he failed to comply. Appellants then fled, returning to the home of appellant Thomas' grandmother approximately one and one-half blocks away. Once inside the house, Thomas told his brother, Michael Thomas, and Roosevelt Kelly, Jr., to go to the corner of 17th and U Streets to bring back three young women who "were in a place where something went down." Messrs. Kelly and Michael Thomas drove to the location, told the three women to get into the auto, then returned with the women to the house where appellants had remained.[1]

Subsequently, during a conversation in the hallway of the house, appellant Sheffield, in a remark apparently directed to no one in particular, stated that two homosexuals had seen the incident, knew him, and would have to be "knocked off." The young women left shortly, whereupon Kelly saw McBride wrap his shotgun in a coat he had borrowed from appellant Thomas and put it into the trunk of the car. Evidently, Michael Thomas and Kelly then drove appellants to their respective homes.

At a photo array session on May 27, 1976, Kelly identified McBride as one of the individuals he had encountered on the evening of January 21. At a subsequent lineup, both Kelly and Jacqueline Wyatt, one of the young women who had witnessed the shooting, identified appellant McBride.

According to Kelly's later trial testimony, before the China Star Cafe incident, he had driven with the Thomas brothers and Richard Sheffield to McBride's home. McBride had come out of the house carrying a bag and entered their vehicle. They then had gone to the house shared by the Thomases

---

1. Charged in Count VIII of the indictment as an "accessory after the fact" (D.C.Code 1973, § 22–106), Michael Thomas stood trial with appellants. The trial judge granted his motion for judgment of acquittal at the close of the government's case.

and Kelly's grandmother. There, appellants Thomas and McBride switched coats. (McBride donned the maroon or burgundy coat later described by witnesses to the shooting.) McBride then removed a shotgun from the bag he had brought and strapped it to his shoulder, told Kelly and Michael Thomas to remain while he and the others went "around the corner," then departed with appellants Sheffield and James Thomas for 15 to 20 minutes. It was after the three had returned from this outing that appellant Thomas had sent his brother, Michael, and witness Kelly after the three women.

At trial, Ms. Wyatt identified McBride as an individual involved in the incident at the cafe. She had never encountered McBride before the incident of January 21–22, but she was familiar with both Sheffield and James Thomas. Both Ms. Wyatt and her sister also placed these other two with McBride at the cafe. Ms. Wyatt, in fact, had spoken with Sheffield and James Thomas just prior to McBride's entry; she had learned that they intended to rob the proprietor.

The grand jury issued an eight-count indictment against appellants on July 21, 1976.[2] Trial began December 15, 1976. At the close of the prosecution's case, the court denied motions by all appellants for judgments of acquittal. None of the appellants proffered any defense evidence. On December 20, 1976, the jury convicted appellants of the charges set forth above. By judgment and commitment orders of February 2, 1977, the court sentenced McBride and Thomas to concurrent terms of 15 years to life on assault Counts I and III. See note 2, supra. McBride also received a concurrent three-to-ten-year sentence for the weapon possession charge. Appellant Sheffield was sentenced on April 12, 1977, to an indeterminate period under the Federal Youth Corrections Act, 18 U.S.C. § 5010(b) (1970).

## II.

We take up, in turn, Thomas' "Interstate Agreement on Detainers" argument, Sheffield's "sufficiency of the evidence for obstruction" claim, and McBride's "suggestiveness of identification" contention.

### A. The Interstate Agreement on Detainers

Appellant Thomas sought dismissal of the indictment in the trial court on the ground that the 180-day "speedy trial" period prescribed by the Interstate Agreement on Detainers (IAD), D.C.Code 1973, § 24–701, et seq., had been exceeded. In denying the motion the court relied on the government's responses that: (1) the 180-day time limitation had not been triggered, and (2) if it had been triggered, the trial had necessarily and reasonably been continued for "good cause," as permitted by the IAD. Because we agree that the 180-day period did not begin to run, we do not reach the continuance issue.

On March 17, 1976, while incarcerated in Maryland in the Prince George's County Detention Center, James Thomas received written notice that "a Detainer ha[d] been placed against him by [the] U.S. Marshal." The warrant number and charge (assault with intent to kill while armed) were specified, and appellant was further "advised that any questions in reference to the above case(s) should be sent to the prosecuting attorney of the issuing jurisdiction." Two weeks later, on April 1, 1976, during a probation revocation hearing in Prince George's County Circuit Court, appellant asked the judge about "squaring away" the District of Columbia detainer. The judge suggested that he write to the District about his desire to be tried, whereupon the

---

**2.** Count I charged McBride, Thomas, and Sheffield with assault with intent to kill while armed. Count II charged the three with assault with intent to kill. Count III charged the three with assault with intent to commit robbery while armed. Count IV charged the three with assault with intent to commit robbery. Count V charged the three with assault with a dangerous weapon. Count VI charged the three with obstruction of justice. Count VII charged McBride with possession of a prohibited weapon. Count VIII charged Michael Thomas with being an accessory after the fact to Counts I through V.

District of Columbia officials would "be put under certain constraints" to remove him to the District for trial. Subsequently, around April 6, appellant sent such a request to his brother, apparently intending that it be routed to an attorney and then to the proper district authority. The fate of the letter is not known. On June 16, 1976, Thomas was brought to the District of Columbia for trial on another charge by means of a writ of habeas corpus *ad prosequendum*. Apparently,. he remained until completion of the present case.[3]

■ The IAD provides a means for a prisoner in one jurisdiction to require the speedy disposition of a case in another jurisdiction when that case provides the basis for the lodging of a detainer against the prisoner. IAD Article III(a) provides:

(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint: *Provided,* That for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appro-

priate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decision of the State parole agency relating to the prisoner. [D.C.Code 1973, § 24–701.]

To facilitate compliance with the statute, Article III(b) states that the prisoner shall give the "written notice and request" to the warden or custodian (in this case, in Maryland), who shall forward it and the required "certificate" to the prosecuting jurisdiction. In order to assure that a prisoner learns about the proper IAD procedure for triggering the 180-day time period. Article III(c) provides:

(c) The warden, commissioner of corrections, or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based.

An assumption inherent in the IAD, therefore, is that an appropriate official of the "custodial" or "sending" jurisdiction (here Maryland) will provide the prisoner with the information necessary for him to assert his right to trial within 180 days in the "prosecuting" or "receiving" jurisdiction (here the District of Columbia).

The written notice furnished by Maryland was not itself sufficient to meet this § (c) requirement. Appellant, however, does not maintain that this deficiency in the written notice alone triggered the running

---

3. Appellant does not rely on the government's failure to bring him to trial within 120 days of his transfer to the District by means of the writ. Although the District of Columbia trial judge, at a status-motion hearing on September 16, 1976, alluded to the 120-day time constraint in Article IV(c) of the IAD, appellant himself never asserted a claim based on that limit. *See United States v. Mauro,* —— U.S. ——, 98 S.Ct.

1834, 56 L.Ed.2d 329 (1978) (once a detainer has been lodged, transfer by means of writ of habeas corpus *ad prosequendum* is tantamount to transfer under specific IAD provisions for purposes of triggering the time constraint). Because appellant did not cite Article IV(c) to the court and does not do so on appeal, we do not address that issue.

of the 180 days.[4] He asserts, rather, that Maryland did not sufficiently inform him of his IAD rights at any other time, and thus that his oral request for information in court on April 1, coupled with the letter to his brother, was enough to achieve "substantial compliance" with his own statutory obligation to deliver "his request for a final disposition" so as to invoke his right to trial within 180 days. Because trial began in the District of Columbia on December 15, 1976, more than 180 days after his April 1 inquiry, appellant contends that the 180-day period had expired, and that the indictment accordingly should have been dismissed.

One court has observed that some states have allowed "the defendant . . . some latitude in complying with [the IAD's] provisions" while others have "more narrowly constru[ed]" it. *People v. Wolever,* 43 Ill.App.3d 25, 30, 1 Ill.Dec. 423, 426, 356 N.E.2d 611, 614 (1976). The latter group of states would easily dispose of the present appeal. According to that line of authority, because the "receiving" jurisdiction (the District of Columbia) never received the requisite written request and certificate— no matter what the reason—the time period could not begin to run. Strict compliance is necessary. *See Isaacs v. State,* 31 Md.App. 604, 358 A.2d 273 (1976). The former group of states, however, has concluded that the 180-day period is triggered by a defendant's "substantial compliance," although most of these states do require at least some form of "actual notice" to the receiving state that the defendant desires to invoke the IAD. *See Ekis v. Darr,* 217 Kan. 817, 539 P.2d 16 (1975); *People v. Wolever, supra; cf. State v. Barnes,* 273 Md. 195, 328 A.2d 737 (1974) (substantial compliance standard applied to Intrastate Detainers Act).

The IAD is intended to be "liberally construed so as to effectuate its purposes." D.C.Code 1973, § 24–701, IAD, Article IX. *See Commonwealth v. Merlo,* 242

Pa.Super. 517, 364 A.2d 391 (1976). Thus, we agree with the states which hold that "substantial compliance" should be the test. There is, of course, a circular path from the prosecuting jurisdiction (lodges the detainer) to the custodial jurisdiction (informs prisoner of IAD rights) to the prisoner (notifies prosecuting jurisdiction through official of custodial jurisdiction, who supplies certificate of conviction) back to the prosecuting jurisdiction (must prosecute within 180 days of notice). Once a detainer has been lodged, therefore, a failure to comply carefully with the statute at any point thereafter could cause the speedy trial scheme to fail. We agree with the Supreme Court of Delaware: "The burden of compliance with the procedural requirements of the IAD rests upon the party states and their agents; the prisoner, who is to benefit from this statute, is not to be held accountable for official administrative errors which deprive him of that benefit." *Pittman v. State,* 301 A.2d 509, 514 (Del. 1973). On the other hand, the "substantial compliance" concept puts a responsibility on the prisoner as well, once he becomes aware that IAD-type rights exist; the custodial state's failure to comply absolutely with its obligations will not necessarily be determinative if the prisoner has sufficient information on which to base an assertion of IAD rights. After reviewing the IAD mechanism, as well as all the interests involved, we conclude that the question of "substantial compliance" by a prisoner should turn on whether he or she has done everything that the IAD jurisdictions could reasonably expect, given their own degree of compliance with a scheme which they have the principal responsibility to implement.

We have assessed the situation here and conclude that appellant received sufficient notice from Maryland for the burden

---

4. Unlike the Uniform Mandatory Disposition of Detainers Act (U.L.A.), the IAD contains no specified time limit on such notification by the custodial (or sending) jurisdiction; it merely mandates that notice shall be given "promptly." Additionally, there is no prescribed statutory sanction for a failure to be prompt, whereas the Uniform Act mandates dismissal. *See State v. Ellis,* 208 Kan. 59, 490 P.2d 364 (1971).

of substantial compliance to fall upon him—a burden he failed to carry. Appellant received a written notice about the detainer, including a direction to address questions "to the prosecuting attorney of the issuing jurisdiction." Just two weeks later, a Maryland court advised appellant to write to the District of Columbia, in order to put it under "constraints" in resolving the charge. This notice, like the earlier written notice of the detainer, did not constitute strict compliance with the notification provision, Article III(c). Nevertheless, we believe that it was sufficient and done "promptly" enough, *id.*, to impose the burden of substantial compliance on appellant. He was obliged at that point to direct a written request to the District, in order to trigger the 180-day speedy trial period.[5]

Had the Maryland court not responded to appellant's inquiry, we would be faced with different questions; e. g., whether the custodial state's omissions, coupled with the prisoner's oral request, were adequate to trigger the 180-day limitation on the receiving jurisdiction (on the theory, perhaps, that the receiving jurisdiction had not sufficiently policed the custodial state's obligation once the detainer had been lodged). Alternatively, if, when the Maryland court advised appellant to contact the District of Columbia, he had written a letter either to the court or prosecutor of the District, without the requisite certificate from Maryland,

he would be presenting here a much stronger case for a finding of "substantial compliance." *See Pittman v. State, supra* (under IAD, prisoner's letter to state attorney general was "sufficient notice" under the circumstances); *cf. Wise v. State*, 30 Md.App. 207, 351 A.2d 160 (1976) (under Intrastate Detainer Act, prisoner's letter to clerk of court, without the requisite "status form," was sufficient compliance to invoke 120-day speedy trial right). Neither of these situations, however, occurred. Instead, appellant was advised to contact the receiving jurisdiction and failed to do so. This omission must be charged to appellant. In these circumstances, absent actual notice to the District of Columbia, we conclude that the IAD's 180-day period was not activated.[6]

A contrary conclusion here would not further the purposes of the Act, for the dismissal sanction for violation of the IAD time limitations is a prophylactic measure designed to induce compliance in other cases. *Dennett v. State*, 19 Md.App. 376, 311 A.2d 437, 441 (1973). In this case an apparently blameless "receiving" jurisdiction would be penalized to the advantage of a defendant who demonstrated a lack of vigor in pressing IAD rights which he generally knew about and had been given advice about how to assert. We therefore hold that the trial court did not err in denying the motion to dismiss appellant's

---

5. Appellant's first clear speedy trial demand to District of Columbia officials appears to have been his motion for expedited trial filed early in September, 1976. If we view this as compliance with his duties under the IAD, and thus as a trigger for the 180-day limit of Article III, it is clear that his December, 1976, trial was well within the statutory period.

6. The Supreme Court of Illinois has reached a similar conclusion in a similar case. *People v. Uplinger*, 69 Ill.2d 181, 13 Ill.Dec. 27, 370 N.E.2d 1054 (1977). In *Uplinger*, a Missouri warden informed the prisoner about an Illinois detainer but not about his right to seek disposition of the underlying charges. The evidence, however, showed that the appellant had contacted his Illinois attorney, who had informed him of his right to request trial in Illinois. The court held that once appellant had been so apprised, the possibility of prejudice from the

warden's omission was eliminated. The court concluded that appellant's subsequent inaction—his failure to send any request to Illinois—constituted noncompliance with his duties under the IAD (called, in Illinois, the Uniform Agreement on Detainers Act):

[I]n light of the particular circumstances attendant in this case, we do not agree with the defendant's contention that the warden's nonfeasance excused defendant from complying with the procedural requirements of the Uniform Agreement. [*Id.* at 188, 370 N.E.2d at 1057].

*See Ekis v. Darr, supra*, in which the Kansas Supreme Court accepted the "substantial compliance" principle but held that the prisoner lost his speedy trial right because of his failure to take further action once the authorities had informed him that his initial IAD notice was defective.

indictment for nonsatisfaction of the IAD. We affirm appellant Thomas' convictions.[7]

### B. Obstruction of Justice

Appellant Sheffield stands convicted of obstruction of justice. D.C.Code 1973, § 22–703.[8] He challenges the trial court's denial of his motion for judgment of acquittal, maintaining that (1) the witnesses to (and other evidence of) this offense were very weak, and (2) even if the witnesses were to be believed, obstruction was not proved as a matter of law because either (a) appellant's alleged statements obstructing justice were not made directly to the witnesses, or (b) the statements were not about the witnesses who heard them but concerned other witnesses, or (c) there was no evidence of an intent to intimidate or influence, or (d) the witnesses were not in fact influenced or intimidated by the alleged remarks.

Although there were several indications that witnesses were not believable, including many impeaching incidents at trial, the fact remains that one of the witnesses positively identified appellant Sheffield as the speaker of the allegedly obstructing statements (two individuals would be "knocked off"). Another witness inferred from the circumstances that Sheffield had made the remark she heard. Because credibility is left to the trier of fact, *Womack v. United States,* D.C.App., 350 A.2d 381, 384 (1976), the jury was entitled to believe this evidence and, accordingly, to find Sheffield guilty beyond a reasonable doubt of making the statements.

We then have the question whether this behavior could amount to obstruction; *i. e.,* whether it constituted, in the words of the indictment, a willful endeavor "by means of intimidation, and threats of force, to obstruct, delay and prevent the communication to an investigator of the District of Columbia Government by [the three women witnesses] of information relating to a violation of a criminal statute in effect in the District of Columbia." Appellant's first two assertions can be dismissed easily. The statute does not require that obstructing statements be directly addressed to the allegedly intimidated witnesses, or that threats of harm be directed toward such witnesses. Expressions of intent to kill certain witnesses, made within earshot of other witnesses, could have a tendency to influence or intimidate those who heard the statements. Such indirect threats can constitute obstruction within the meaning of § 22–703.

---

7. Appellant Thomas also alleges insufficiency of the evidence because "the testimony of each of the principal witnesses here was replete with fallacies, motive, and reason for its being discredited." Essentially, appellant challenges the trial judge's denial of his motion for judgment of acquittal. In reviewing such a claim we are to determine only *whether a reasonable trier of fact could find guilt beyond a reasonable doubt. Womack v. United States,* D.C.App., 350 A.2d 381 (1976); *Crawford v. United States,* 126 U.S.App.D.C. 156, 375 F.2d 332 (1967); *Curley v. United States,* 81 U.S.App.D.C. 389, 160 F.2d 229, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). "This evidence must be viewed in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Womack v. United States, supra* at 384 (citations omitted). Under these standards there was more than ample direct evidence to justify denial of the motion and appellant's subsequent conviction by the jury.

8. D.C.Code 1973, § 22–703 provides in relevant part:

Obstructing justice.

(a) Whoever corruptly, by threats or force, endeavors to influence, intimidate, or impede any juror, witness, or officer in any court in the District in the discharge of his duties, or, by threats or force, in any other way obstructs or impedes or endeavors to obstruct or impede the due administration of justice therein, or whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats of force, to obstruct, delay, or prevent the communication to an investigator of the District of Columbia government by any person of information relating to a violation of any criminal statute in effect in the District of Columbia, or injures any person or his property on account of the giving by such person or by any other person of such information to any such investigator in the course of the conduct of any criminal investigation, shall be fined not more than $1,000 or be imprisoned not more than three years, or both.

The indirect nature of the threat is, of course, relevant to appellant's third contention; *i. e.,* that there was no evidence of intent to influence or intimidate the witnesses who heard the statements. Ordinarily, such intent must be inferred from the context and nature of the alleged criminal conduct. Contrary to appellant's argument, the circumstances and character of his remarks afforded the jurors a basis to conclude that he intended the statements to prevent the witnesses who heard them from communicating with investigators. When the evidence shows that eyewitnesses have been retrieved from the scene of a crime, transported to the presence of those who committed it, and then informed that others who saw the offense would have to be "knocked off," the jury legitimately can infer an intent to obstruct justice.

█ Appellant asserts, finally, that obstruction was not proved because the witnesses who testified were not, in fact, influenced or intimidated. The language of the obstruction-of-justice provision prohibits an "endeavor" to influence or intimidate. *See* note 8, *supra.* We agree with the cases interpreting analogous federal statutes, 18 U.S.C. §§ 1503, 1510 (1970), that "proof of the success of the threat is not an element of the offense." *United States v. Carzoli,* 447 F.2d 774, 778 (7th Cir. 1971), *cert. denied,* 404 U.S. 1015, 92 S.Ct. 673, 30 L.Ed.2d 662 (1972). *See United States v. DeStefano,* 476 F.2d 324, 330 (7th Cir. 1973); *Knight v. United States,* 310 F.2d 305 (5th Cir. 1962); *Catrino v. United States,* 176 F.2d 884 (9th Cir. 1949); *United States v. St. Clair,* 418 F.Supp. 201 (E.D.N.Y.1976), *aff'd,* 552 F.2d 57, *cert. denied,* 433 U.S. 909, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977). "[I]t is not necessary to prove that a witness was actually intimidated by the threats, but only that the threats had a reasonable tendency to so intimidate." *United States v. DeStefano, supra* at 330. We therefore reject appellant Sheffield's final argument.

We hold that the trial court correctly concluded that the evidence was sufficient for reasonable jurors to find appellant guilty of obstruction of justice beyond a reasonable doubt. *Womack v. United States, supra.* Appellant Sheffield's conviction is affirmed.

### C. *Suggestiveness of the Identification Sessions*

Before trial, appellant McBride moved to suppress Mr. Kelly's photographic array and lineup identifications, as well as Ms. Wyatt's lineup identification, on the ground that the procedures were impermissibly suggestive. The trial court denied the motions, deciding that there was nothing suggestive about the photographic array or the lineups and, in any event, that both witnesses had "independent sources" for the in court identifications. We agree.

█ Identification procedures are vulnerable to Fifth Amendment due process challenge if "unnecessarily suggestive and conducive to irreparable misidentification." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). *See Patterson v. United States,* D.C.App., 384 A.2d 663 (1978). Appellant McBride contests the photo array shown to witness Kelly, because (1) McBride's picture, number 10 in the array of 100, was shown last (the officer began, allegedly without design, at number 11); (2) the witness knew the other two defendants; (3) the police may have told the witness appellant's name in advance[9]; (4) the witness did not see the shooting; (5) the witness' encounters with McBride were relatively brief; and (6) four months had elapsed between the crime and the identification. None of these factors indicates suggestiveness, save the first, and we do not find any inherent suggestion in the fact that appellant's picture was shown last in an array of 100. It had to appear somewhere, and there is no evidence that the witness was aware that the photo he identified was to be the last one shown.

█ Further, after viewing a photograph of the lineup, we conclude that the

---

**9.** At the suppression hearing, however, Mr. Kelly testified that he identified a man known to him only as "James," and that he did not learn his full name until after the identification.

trial court did not err in concluding that the lineup was not suggestive. Appellant's claim that he was conspicuous because the witness was looking for a tall, thin person, and he was the only tall, thin individual in the lineup, is not supported by an examination of the photograph; and the lineup's character did not otherwise suggest McBride to the witness. Again, the other factors—time between crime and identifications, as well as unnecessarily furnishing appellant's name to the witnesses—did not make the lineup suggestive.

The trial court correctly denied the motion to suppress the photographic identification and both lineup identifications; there was no unnecessary suggestion. *Stovall v. Denno, supra.*[10] We affirm appellant McBride's convictions.[11]

*Affirmed.*

---

10. Although we need not reach the question whether the in court identifications had an "independent source" (or were "reliable nonetheless"), *Patterson v. United States, supra* at 665, we are in accord with the trial judge's further conclusion that under the factors specified in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), and *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the identifications were reliable.

11. Appellant McBride's sufficiency of the evidence claim, partially founded upon the suggestiveness and unreliability of the identifications and partially grounded in witness credibility, must fail for the same reasons as those of his coappellants. There was more than ample direct evidence of guilt. *See Womack v. United States, supra; Crawford v. United States, supra.*