Perry L. WOODALL, Appellant,

v.

UNITED STATES, Appellee.

No. 95–CF–84.

District of Columbia Court of Appeals.

Argued Sept. 21, 1995.

Decided Oct. 24, 1996.

Giannina Lynn, Washington, DC, for appellant.

Thomas A. DiBiase, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Kenneth C. Kohl, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and STEADMAN, Associate Judges.

WAGNER, Chief Judge:

Appellant, Perry Woodall was convicted following a jury trial of one count of obstruction of justice in violation of D.C.Code § 22–722 (1996). His principal argument on appeal is that he was convicted for conduct not alleged in the indictment in violation of his Fifth Amendment right to be tried only on charges returned by the grand jury. He also argues for reversal on the grounds that the trial court failed to strike a police officer's testimony as a sanction for the loss of *Jencks* [1] material and denied a motion for mistrial when other acts of witness intimidation were admitted into evidence. We affirm.

### I.

On November 23, 1993, Ms. Joletha Simmons witnessed a murder at 18th and D Streets, N.E. As she came out of a liquor store at that corner at about 5:45 p.m., Simmons saw Clarence Scott and two other men shoot her friend, Danny King. After the men had fired nine or ten shots, Simmons saw Scott run toward 1816 D Street while the other men ran in the opposite direction. Simmons ran over to King and called out for assistance. While trying to assist King, Simmons heard someone from the crowd, which had gathered, instruct her to remove King's money. She removed a substantial amount of money and a black bag containing drugs and money from King's body. A bystander, Ricardo Land, snatched the items from Simmons.[2]

Appellant Woodall, an acquaintance of Simmons, approached her and said, "If you know what's good for you[,] you'll keep your mother f[——]ing mouth shut or you'll end up just like him," pointing to King. Simmons testified that she felt threatened by Woodall's statement.

Two police officers, Brett Smith and Stanley Nelson, arrived at the scene of the homicide about 5:50 p.m. Officer Smith testified that he saw King's body in the street surrounded by a crowd of people, and he began to secure the scene with police tape and to canvass for witnesses. He noticed Simmons, who was in a "state of hysteria." When the officers tried to speak with Simmons to determine whether she had witnessed the crime, Woodall interrupted them. Woodall tried to prevent Simmons from speaking with the police officers, indicating that he was Simmons' husband. He tried to pull Simmons away from the officers and told her, "You don't have to talk to him, you don't have to say shit to him." The officers warned Woodall that he was interfering with a murder investigation, but he continued to pull Simmons away forcefully, telling her that she "ain't got to say nothing to him." Woodall and the officers engaged in a tug-of-war over Simmons until finally the officers physically forced Woodall to remove his hand from Simmons' arm. Once she was freed, Simmons ran away from the officers and Woodall. Officer Smith caught up with Simmons about one hundred yards away. She told Officer Smith, "I can't talk to you, they'll kill me." Officer Smith told her to pretend to faint so he could put her in an ambulance.

Meanwhile, Officer Nelson detained Woodall in an effort to obtain some general information. Officer Nelson filled out a PD–47 contact card related to Woodall to obtain general information.[3] As Officer Nelson completed the card, Detective Michael Bilek arrived at the scene. Detective Bilek testified that he overheard Woodall saying that Simmons "better keep her mother f[——]ing mouth shut." Detective Bilek later interviewed Simmons about the murder at another location.

1. See *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

2. Land corroborated Simmons' account of the shooting. He witnessed the shooting from an alley near 18th and D Streets. Land also testified that he was the one who took money that Simmons removed from King's pockets in order to give it to King's family.

3. The PD–47 card was missing at trial. Officer Nelson testified that at the end of his shift, he turned over all of his reports, including the PD–47 on Woodall, to his check-off official. The files were searched as far back as 1991, but the cards were not found. Defense counsel filed a motion to strike Officer Nelson's testimony as a *Jencks* sanction on the basis of the missing PD–47 card. This motion was denied by the trial court.

After the shooting, Simmons entered a witness protection program because she feared that her life was in jeopardy. At trial, Simmons denied receiving $40,834 from law enforcement authorities, but she recalled getting $200 a week at times, and $300 a week sometimes. The only defense witness, Deputy U.S. Marshal Hilton Coleman, was called to impeach Simmons. He testified that Simmons had been paid $40,834 by the witness protection program.

Detective Reed, the lead investigator of the King homicide, testified that Simmons was an important witness in the King murder case as well as another homicide. He also testified that she was placed in the witness protection program because of a threat at the homicide scene and because he became aware that the "18th and D crew was trying to find her, and her boyfriend's car, which was known in that area, had been set on fire." Defense counsel objected and moved for a mistrial on the ground that these statements were "prejudicially problematic." The government argued that the information was not offered to suggest that Woodall was involved in the car fire. The trial court denied the motion, and gave the jury a limiting instruction. Specifically, the court instructed the jury that the information was being admitted "only ... for your consideration on the issue of the legitimacy of the placement of Miss Simmons in the witness protection program, and that it was not evidence against Woodall on the charges in the case."

## II.

■ Woodall argues that his conviction must be overturned because the court's instruction to the jury permitted him to be convicted for conduct not alleged in the indictment in violation of his Fifth Amendment right to be tried on charges returned by a grand jury.[4] Specifically, he contends that the indictment was constructively amended at trial because the indictment charged that he "wilfully endeavored by means of threats and physical force" to prevent the complaining witness, Simmons, from communicating to the police, while the court instructed the

jury that he could be convicted of harassment, consistent with the government's proof at trial. The government concedes that the language of the indictment tracked the former obstruction of justice statute, while the trial court's jury instruction was based upon the new statute. However, the government argues that there was no constructive amendment because the indictment and instructions charged Woodall with conduct which also violates the new obstruction of justice statute. In any event, the government contends Woodall has failed to show plain error. We examine first the factual background underlying Woodall's Fifth Amendment challenge.

Woodall was indicted for obstruction of justice in violation of D.C.Code § 22-722(a)(3), on April 26, 1994. The indictment reads as follows:

On or about November 23, 1993, within the District of Columbia, Perry Louis Woodall, wilfully endeavored by means of threats and physical force to obstruct, delay and prevent the communication to an investigator of the District of Columbia government by Joletha Simmons of information relating to the violation of District of Columbia Code Sections, 22-723, 22-3811, and 22-2401, criminal statutes then in effect in the District of Columbia (Obstructing Justice, in violation of 22 D.C.Code Section 722(a)(3)).

The foregoing language mirrors the language of the former D.C.Code § 22-722(a)(3) rather than the provision in effect at the time of the commission of the offense. By that time, a new version of the obstruction of justice statute was in effect which reads:

(a) A person commits the offense of obstruction of justice if that person: ...

(3) Harasses another person with the intent to hinder, delay, prevent, or dissuade the person from:

...

(B) Reporting to a law enforcement officer the commission of, or any information concerning, a criminal offense ...

4. The pertinent part of the Fifth Amendment reads: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."

D.C.Code § 22–723(a)(3)(B) (1996). During preliminary instructions to the jury, the trial court explained the charge to the jury as follows:

> The United States alleges that on or about November 23, 1993, the defendant Perry Woodall obstructed justice by attempting to prevent a person named Joletha Simmons from communicating with an investigator of the District of Columbia Government concerning an incident which had just occurred, and that is the murder or the shooting and killing of a person named Daniel King in the area of 1816 D Street, Northeast.

In addition, the court read as an element of the offense, language which followed the language of the former statute. Specifically, the court explained:

> [T]hat the defendant endeavored by means of intimidation, force, threat of force, to obstruct, delay or prevent the communication to an investigator of the District of Columbia Government by the complainant, and the complainant again is Joletha Simmons.

During the testimony of the first witness, the trial court realized that it had read the elements of the former statute and alerted the parties, stating that the statute had been amended and required only harassment.[5] Apparently, the court did not realize that the language of the indictment tracked the former statute, and Woodall registered no objection at that time.

At the close of the evidence, the trial court instructed the jury on the first element of the offense that the government must prove, applying the language of the new statute as follows:

> that defendant harassed, Joletha Simmons with the ... specific intent to hinder, delay, prevent or dissuade her from reporting to a law enforcement officer the commission of, or any information concerning a criminal offense.

The court also defined the word, "harassed," as:

> Any words or actions having a reasonable tendency to badger, disturb or pester the ordinary person. Harassment may involve a series of acts or even just a single act.

In the trial court, defense counsel did not argue that the instruction had the effect of constructively amending the indictment or otherwise object to the instruction.

 Since Woodall did not raise the issue of constructive amendment of the indictment in the trial court, our review is for plain error. *See Johnson v. United States,* 616 A.2d 1216, 1232 (D.C.1992), *cert. denied,* 507 U.S. 996, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993) (citing *Watts v. United States,* 362 A.2d 706 (D.C.1976) (en banc)). Plain error will be found in those exceptional circumstances where the "errors complained of [are] so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts,* 362 A.2d at 709 (citations omitted). Woodall contends that even under a plain error standard, the error was so substantial that reversal is required. Citing this court's decision in *Scutchings v. United States,* 509 A.2d 634 (D.C.1986), Woodall argues that *per se* reversal is required because the indictment was amended here in such a way as to deprive him of his constitutional right to be indicted by a grand jury before being required to stand trial on the charge.

In *Scutchings, supra,* this court reversed a defendant's conviction under the obstruction of justice statute "[b]ecause of the likelihood that [Scutchings] was convicted on a charge other than one for which the grand jury indicted him." 509 A.2d at 639. The grand jury had charged that Scutchings " 'corruptly endeavored by threats and force to influence, intimidate, and impede *Michael Dobbins* in the discharge of his duties as a witness' " in a criminal case, while the government sought to prove that Scutchings attempted to dis-

---

5. The trial court stated:

> I read the old instruction elements, and the statute has been amended, and it includes [a] new subsection, and it's actually [the] subsection this defendant was charged under. Which doesn't even require an interference, all it requires is harassment, and I did—I did it unintentionally, but I thought I ought to lay it out on the record that I perhaps unwittingly misdirected the Government slightly in this area because the charge indicted is under the new section ... harassing subsection.

suade *Patricia Dobbins,* not Michael Dobbins, from testifying. *Id.* at 638 (emphasis in original). In instructing the jury, the trial court included as an additional means of Scutchings' attempt to influence the witness, bribery, which was not a means alleged in the indictment. *Id.* Therefore, we held:

> Where ... a grand jury specifically charges essential elements of a crime, such as means and party, and the government, bolstered by the trial court's instructions, proves entirely different elements, the disparities constitute a constructive amendment of an indictment.

*Id.* (citations omitted).

The rule is that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States,* 361 U.S. 212, 215–16, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960) (citing *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887)).[6] "The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment." *Stirone,* 361 U.S. at 218–19, 80 S.Ct. at 274. Therefore, if the indictment was broadened or otherwise constructively amended such that Woodall may have been convicted of an offense different from that charged by the grand jury, reversal might well be required. *See Johnson, supra,* 616 A.2d at 1232. The government contends that there was no constructive amendment or improper expansion of the indictment here. It argues that this case is more analogous to those in which the indictment alleged more than required, and surplusage was removed. *See Miller, supra* note 6, 471 U.S. at 141, 105 S.Ct. at 1818.

Generally, departures from the indictment occur in two ways, amendments and variances. At issue here is whether an amendment occurred.[7] "'An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or court after the grand jury has last passed upon them.'" *Scutchings, supra,* 509 A.2d at 636 (quoting *Gaither, supra* note 7, 134 U.S.App. D.C. at 164, 413 F.2d at 1071). Thus, when the trial court submits for the jury's consideration "'an element of the charge that differs from the specific words of the indictment,'" a constructive amendment has occurred. *Johnson, supra,* 616 A.2d at 1232 (citing *Stirone, supra,* 361 U.S. at 217–18, 80 S.Ct. at 273–74). When an indictment is constructively amended, the conviction will only be reversed "if the evidence introduced at trial and the judge's instructions to the jury 'raise the substantial likelihood that appellant may have been convicted of a crime different from that charged by the grand jury.'" *Johnson,* 616 A.2d at 1232. *See also Scutchings,* 509 A.2d at 638. While charges cannot be broadened to add new elements, *Stirone,* 361 U.S. at 215–16, 80 S.Ct. at 272–73, "[a]s long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *Miller, supra,* 471 U.S. at 136, 105 S.Ct. at 1815.

Here, Woodall was not convicted of a different crime than that charged in the indictment. The indictment charged a violation of D.C.Code § 22–722(a)(3), the offense for which Woodall was convicted. Although the language in the indictment contains the language of the prior statute, the new statute encompasses the conduct prohibited under the old statute. The legislative history for the new statute is illuminating. The obstruction of justice statute was amended in

---

6. Subsequently, the Supreme Court rejected one aspect of *Bain* which found it to be an unconstitutional amendment of the indictment to eliminate unnecessary allegations. *United States v. Miller,* 471 U.S. 130, 144, 105 S.Ct. 1811, 1819, 85 L.Ed.2d 99 (1985). However, the Supreme Court retained *"Bain's* more general proposition concerning the impermissibility of actual additions to the offenses alleged in an indictment." *Id.*

7. A variance involves no change in the charging terms of the indictment, "'but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Scutchings, supra,* 509 A.2d at 636 (quoting *Gaither v. United States,* 134 U.S.App. D.C. 154, 164, 413 F.2d 1061, 1071 (1969)).

response to the widespread corruption, intimidation, and murder of witnesses in the District, and to provide "an additional weapon ... to combat the obstruction of justice." REPORT OF THE COMMITTEE ON THE JUDICIARY TO THE COUNCIL OF THE DISTRICT OF COLUMBIA ON BILL 9–385, at 2 (1992).[8] The new statute was intended to "expand the scope of the [old] obstruction of justice statute to encompass the wide-range of activities used by criminals to impede justice...." *Id.* The "harassment" section was intended to prohibit only conduct "that is corrupt, threatening or intimidating with the purpose of impeding the criminal justice process." *Id.* at 3. Thus, the statute was intended to reach a broad range of conduct, including threats and physical force, intended to obstruct justice.

The indictment charged Woodall with using "threats and physical force," while the court's instruction to the jury permitted conviction if Woodall harassed the victim. The trial court defined harassment to include "words or actions having a reasonable tendency to badger, disturb or pester the ordinary person." Such conduct by words or actions necessarily would include threats or physical force as the most serious type of prohibited conduct. Under similar circumstances, this court rejected the argument that an indictment was fatally defective because the defendant was charged under an obstruction of justice statute which had been repealed three weeks prior to the offense. *See Scutchings, supra,* 509 A.2d at 639. The rationale for the ruling was that the former statute had been replaced with D.C.Code § 22–703 "which proscribes not only the same, but a broader range of conduct," and the new statute encompassed the defendant's conduct. *Id.* In *Scutchings,* the trial court applied the law in effect at the time of the commission of the offense to the facts; therefore, we found no prejudice resulting from the erroneous citation to the repealed statute. *Id.*

■ In this case, Woodall had notice of the statute under which he was charged and the specific conduct of which he was accused which formed the basis of his violation of the statute. The principal purposes of the Grand Jury Clause of the Fifth Amendment are (1) to inform the accused of the charges against him so that he can prepare his defense, (2) to provide a description sufficient to enable protection against future jeopardy for the same crime, and (3) to guard against any actions by the prosecutor or the courts which might alter the charge to fit the proof. *Scutchings, supra,* 509 A.2d. at 636. It does not appear that these purposes were thwarted here.

Woodall was apprised of the specific acts he was alleged to have committed which would be encompassed within the meaning of "harassment" under the new statute which was cited. The government's evidence established that Simmons witnessed the murder of David King. Following the murder, Woodall approached Simmons and told her that if she knew "what's good for you[,] you'll keep your mother f——ing mouth shut or you'll end up just like him," pointing to King. Simmons told Officer Smith that if she spoke to him, she would be killed. Also, Officer Nelson testified at trial that he overheard Woodall tell Simmons that she "better keep her mother f——ing mouth shut." Such conduct was proscribed under the former statute as well as under the new version which includes the harassment language.[9] The prosecutor's proof and the court's instructions encompassed conduct prohibited under the former and later obstruction of justice statute. Therefore, Woodall suffered no prejudice that would warrant reversal. The same facts which formed the basis for the indictment were presented at trial.[10] Woodall had ade-

**8.** The Bill was known as the "Law Enforcement Witness Protection Amendment Act of 1992."

**9.** BARRON'S LAW DICTIONARY, 514 (4th ed.1996) defines a "threat" as "[the] declaration of an intent of determination to inflict punishment, loss, or pain on another, or to injure another by some wrongful act." It defines "harassment" as "any exercise of authority in such manner as to be unnecessarily oppressive; ... actions and con-

duct motivated by a malicious, ... purpose." *Id.* at 227. Even though to "harass" implies generally continual vexation, the trial court defined it here to include a single act or instance of harassment.

**10.** *Cf. Wright v. United States,* 564 A.2d 734, 737 (D.C.1989) (appellant's conviction rested upon facts crucially different from those presented to the grand jury).

quate notice to allow him to prepare a defense. *See Scutchings, supra,* 509 A.2d at 636 (the indictment must apprise the accused of the charges so he may adequately prepare a defense). Finally, Woodall was tried on the same charges set forth in the indictment.[11] Therefore, on this record, we cannot conclude that Woodall's Fifth Amendment grand jury right was violated. *See Williams v. United States,* 641 A.2d 479, 482 (D.C. 1994). In any event, we clearly find no plain error, that is error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Foreman v. United States,* 633 A.2d 792, 795 (D.C. 1993); *see also Johnson, supra,* 616 A.2d at 1232; *Jackson, supra,* 650 A.2d at 663.

## III.

■ Woodall also argues for reversal because the trial court failed to strike the testimony of a police officer as a sanction for losing a PD–47 contact card. Prior to the cross-examination of Officer Nelson, the court held a *Jencks* hearing at which the officer testified that he turned the card in at the end of his shift, but he was unable to locate the card after a search conducted by the detectives in the Fifth District.[12] The trial court denied Woodall's motion to strike the officer's testimony. Although the trial court determined that the PD–47 card was *Jencks* material, it concluded that the loss of the card was due to negligence, but not gross negligence and that there was no significant prejudice to Woodall which warranted the severe sanction of striking the testimony.

■ The government and its investigative agencies have a duty to disclose and preserve statements of witnesses covered by the Jencks Act, 18 U.S.C. § 3500 (1994). *(Kenneth) Montgomery v. United States,* 384 A.2d 655, 661–662 (D.C.1978). The policy underlying this rule is that "disclosure might be avoided by destroying vital evidence, before prosecution begins or before defendants

hear of its existence." *Id.* at 662. The government's responsibility under the Act is violated when the evidence is lost or missing due to "negligence or purposeful destruction accompanied by either bad motive or bad judgment." *Id.* Here, the trial court found that the PD–47 form was missing due to the negligence of the police officer. "[T]he administration of the Jencks Act must be entrusted to the 'good sense' and 'experience' of the trial judge subject to 'appropriately limited review of appellate courts.'" *United States v. (Carroll) Montgomery,* 478 A.2d 1088, 1090 (D.C.1984) (quoting *United States v. Augenblick,* 393 U.S. 348, 355, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969)). If the rule of preservation is violated, the court must consider the totality of circumstances in determining what sanctions to apply. *(Kenneth) Montgomery, supra,* 384 A.2d at 662. "In fashioning the appropriate sanction, the court should 'weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice.'" *Id.* This court will reverse the trial court's determination as to the appropriate sanction only for an abuse of discretion. *Id.*

Against these considerations, we find no abuse of discretion. The trial court considered the degree of negligence involved, finding that misplacing the card was negligence, but not gross negligence. Second, the court found no significant prejudice. There were other sources of the same information about which the officer testified. In addition to the testimony of Simmons and Mr. Land as to Woodall's threats and physical force, another police officer also testified about the incident. Therefore, the material, as the trial court observed, would have been of little value to Woodall in any event. *See (Kenneth) Montgomery, supra,* 384 A.2d at 663. Woodall also argues that if the information had been available, the jury might have questioned whether Woodall was the person who con-

---

**11.** *Cf. Hayward v. United States,* 612 A.2d 224 (D.C.1992) (amendment of obstruction of justice count in indictment to charge of willfully endeavoring to obstruct, delay, or prevent communication to investigator relating to crime, from prior charge of corruptly attempting to influence or

intimidate witness, resulted in defendant being convicted of offense different from that charged in the indictment).

**12.** *See* note 3, *supra.*

fronted Simmons at the scene of the crime. We reject this argument. Identification was not an issue at trial. On the contrary, Woodall's defense was that he sought to counsel Simmons out of fear that her life might be endangered if she were seen talking to the police at the scene of the crime.

### IV.

██ Finally, Woodall argues that the trial court erred in denying his motion for mistrial after evidence of other acts of witness intimidation was admitted. The government contends that the challenged evidence was admissible to explain the reasons that Simmons entered into the witness protection program, after her motives were questioned at trial. The government also contends that any possible prejudice was cured by a limiting instruction.

At trial, Simmons testified that she was placed in the witness protection program because she feared for her safety. On cross-examination, Woodall's counsel attempted to elicit that she had received a substantial amount of money from her involvement in the program. Detective Reed testified during the government's case-in-chief that Simmons was placed in the program because of the initial threat at the scene of the homicide. He also testified that following the shooting, individuals known to frequent 18th and D Streets, Northeast, attempted to locate Simmons through family members and that her boyfriend's car was set on fire. Woodall moved for a mistrial on the ground that this information was prejudicial because it linked Woodall to these events. The trial court gave the following limiting instruction concerning the evidence:

> Ladies and gentlemen of the jury, you've heard about these incidents, the car being set on fire, 18th and D, making calls, people from 18th and D Street, you've heard no connection to the defendant on any of that information, and that information is only being admitted, only being admitted for your consideration on the issue of the legitimacy of the placement of Miss Simmons in the witness protection program. That's the only reason why that testimony

is being admitted. And you're not to consider it in any other way in this—in this proceeding. It's not evidence against this defendant on the charge here, and certainly not to be considered by you as evidence against the defendant on the charge.

██ Whether to grant a mistrial is committed to the trial court's broad discretion, and we will not reverse it unless it appears unreasonable, irrational, and unfair "or unless the situation is so extreme that failure to reverse would result in a miscarriage of justice." *Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989). No such circumstances are presented in this case. The testimony had some relevance once Simmons' motives were questioned. *See Carpenter v. United States,* 635 A.2d 1289, 1293 (D.C.1993). Even assuming any harm was caused by admitting the evidence, it was ameliorated by the limiting instruction given by the trial court. Therefore, we find no prejudice warranting reversal. *See Gaither, supra* note 6, 134 U.S.App. D.C. at 172, 413 F.2d at 1079.

For the foregoing reasons, the judgment appealed from hereby is

Affirmed.