*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CF-22

RONALD WYNN, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-20026-08)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Argued  December 6, 2012                    Decided November 21, 2013)

*David H. Reiter* for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *T. Patrick Martin*, and *Sharad S. Khandelwal*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and OBERLY, *Associate Judges*, and FERREN, *Senior Judge*.

OBERLY, *Associate Judge*:   Ronald Wynn appeals his convictions for voluntary manslaughter while armed, possession of a firearm during a crime of

violence ("PFCV"),[1] carrying a pistol without a license ("CPWL"),[2] felon in possession of a firearm ("FIP"),[3] possession of an unregistered firearm ("UF"),[4] possession of unregistered ammunition ("UA"),[5] and obstruction of justice.[6] Wynn's convictions arise out of the shooting of Daniel Clark on July 28, 2008. At his first trial, Wynn was convicted of CPWL, FIP, UF, UA, and obstruction of justice, but the jury hung on the PFCV count and the original count of first-degree murder.[7] Wynn was convicted of PFCV and the lesser-included offense of voluntary manslaughter while armed at his second trial. He now makes three arguments on appeal. First, Wynn argues that the evidence was insufficient to support his conviction under D.C. Code § 22-722 (a)(3)(B), the portion of the Code that criminalizes the harassment of witnesses with the intent to obstruct the reporting of criminal offenses to law enforcement. Second, he claims that juror coercion tainted his convictions for CPWL, FIP, UF, UA, and obstruction of justice at his first trial. Finally, Wynn contends that the trial court erred at his second trial by permitting a witness to claim the privilege against self-incrimination when otherwise that witness would have testified favorably for him.

---

[1] D.C. Code § 22-4504 (b) (2012 Repl.).
[2] D.C. Code § 22-4504 (a) (2012 Repl.).
[3] D.C. Code § 22-4503 (a)(1) (2012 Repl.).
[4] D.C. Code § 7-2502.01 (a) (2012 Repl.).
[5] D.C. Code § 7-2506.01 (a) (2012 Repl.).
[6] D.C. Code § 22-722 (a)(3)(B) (2012 Repl.).
[7] D.C. Code §§ 22-2101, -4502 (2012 Repl.).

We agree with Wynn's first argument and reverse the judgment against him for obstruction of justice. We find his other arguments without merit and affirm the remainder of his convictions.

## I. Facts

## A. The Shooting

On the late afternoon of July 28, 2008, Daniel Clark, his wife Bonita Clark, and their children arrived at a cookout at the Buena Vista Terrace apartments near their home in Southeast, Washington, D.C. A few hours into the cookout, Wynn drove up to an apartment near the cookout and dropped off his co-worker Terrence Brooks. Wynn and Brooks double-parked Wynn's car on the street in front of the cookout and exited the vehicle. Wynn left the car in the street and went to talk to some people he knew at the cookout. Bonita approached Wynn and asked him to move his car so that other vehicles could drive down the street unimpeded. A verbal, and possibly physical, dispute ensued between Bonita and Wynn. The argument escalated when Daniel approached Wynn and took issue with Wynn's behavior toward Bonita. The quarrel turned violent and the two men fought until separated by other people at the cookout. Witnesses testified that Wynn said to Daniel, "I kill little niggers like you."

Daniel told Wynn to "stay here" and walked toward his home. Several witnesses saw Wynn then retrieve a pistol from his car. After obtaining his pistol, Wynn followed Daniel and tapped him on the shoulder. Wynn shot Daniel in the head when he turned around. After he shot Daniel, Wynn reportedly said, "Fuck you and your bitch."

Wynn fled the scene and went to the apartment of his girlfriend, Veronica Morris, several blocks away. At the apartment, Wynn changed out of his clothes and spoke to Veronica's daughter, Brittany, telling her that "nothing was wrong."

## B.     Wynn's Interactions with Veronica and Brittany Morris

Although Wynn told Brittany that "nothing was wrong," he asked her to call her mother. Wynn told her to tell Veronica that if anyone asked Veronica about Wynn, Veronica was to say that Wynn had been with her at the time of the shooting. Veronica, unaware of any of the facts surrounding the shooting, was confused and repeatedly asked Brittany what was happening. In response, Wynn told Brittany to tell her mother not to worry, which Brittany did. Veronica testified that her reaction to Wynn's message was one of substantial confusion. She said

that "she didn't even pay [any] attention to [Wynn's request]" because she "didn't comprehend it at all." Wynn, who had been regularly staying at Veronica's apartment in the days leading up to the shooting, fled and did not have any interaction with Veronica until several days later. Wynn called Veronica by phone and told her that "it wasn't me," but kept the discussion to a minimum for fear of police monitoring.

### C.  Jury Deliberations in the First Trial

Eventually, the police arrested Wynn and he was tried for first-degree murder. Wynn testified in his own defense. He claimed that after Daniel Clark appeared to walk away, he doubled back and approached Wynn aggressively with a gun. Wynn told the jury that he believed that Daniel was going to shoot him. He stated that he reacted and shot Daniel in self-defense with a gun he was carrying on his person.

During the first few days of deliberations, the jury sent a series of notes to the trial court. All of the jury's substantive notes dealt with the legal issues surrounding the murder count. The evening of the third day of deliberations, the jury told the trial court that it could not reach a unanimous verdict on the murder

count and explained that the disagreement concerned whether there were "mitigating circumstances" attendant to the shooting. The court dismissed the jury for the evening without responding directly to its note. The morning of the fourth day of deliberations, a Friday, the court asked the jury whether it had reached a unanimous verdict on any count. The jury responded that it had not. Then, with the consent and encouragement of defense counsel, the trial court gave the jury an "anti-deadlock" instruction.

That afternoon, the jury sent another set of notes to the court. First, it sent a note stating, "We do not have [*sic*] unanimous verdict." The trial court did not respond to that note, believing it to be simply a "status update." Shortly thereafter, the jury followed with another note asking if it could return a verdict on the PFCV and obstruction of justice counts if it had not yet reached a verdict on the murder count. The trial court declined to give the jury the option of returning a verdict on the PFCV count, considering it too closely intertwined with the murder count. However, the court did inform the jury that it would be allowed to return a verdict on the obstruction of justice count and any other count on which the jury had reached a unanimous verdict. Before verdicts were returned, Wynn's defense counsel moved for a mistrial on all counts, which the trial court denied.

In response to the court's instruction, the jury sent a note attempting to inform the court where it stood on a count-by-count basis. The court, mistakenly believing that the note contained numerical splits on individual counts, did not read the note and sent it back to the jury. The jury followed by informing the trial court that it was prepared to give verdicts on the CPWL, FIP, UF, UA, and obstruction of justice counts. The trial court accepted the partial verdict and the jury found Wynn guilty on all counts, except for the murder and PFCV offenses on which the jury was still deliberating. The trial court dismissed the jury for the weekend and instructed it to resume deliberations on the remaining counts the following Monday.

After deliberating Monday morning, the jury sent a final note stating that it could not reach a unanimous verdict on the first-degree murder and PFCV counts. The defense moved for a mistrial and the trial court granted the motion. The trial court noted its concern that doing otherwise might have the appearance of coercing the jury.

### D.     The Second Trial and Terrence Brooks

At Wynn's second trial for PFCV and first-degree murder, his defense counsel informed the trial court that Wynn intended to call Terrence Brooks, Wynn's co-worker and the person that Wynn dropped off near the cookout before the shooting.  Defense counsel proffered that Brooks would testify that he had seen Daniel Clark with a gun in his hand shortly before the shooting, thereby bolstering Wynn's claims of self-defense.  Specifically, defense counsel stated:

> [Brooks] is going to testify that . . . he came down the steps, he briefly saw [another witness] in the hallway going up to his apartment, and [Brooks] said to him that he had to go to the bathroom . . . .  And during this conversation − this encounter with [the other witness] that Mr. Brooks will testify he saw [the other witness] and Mr. Clark, the decedent, handling a silver-colored handgun.  Passing it back and forth between each other.

However, Brooks testified during the grand jury investigation and denied any knowledge of substantive facts related to the shooting.  Specifically, he told the grand jury that he never saw Daniel Clark with a gun.  Brooks's appointed defense counsel informed the trial court that, if called by Wynn to testify, Brooks would assert his Fifth Amendment privilege against self-incrimination on the basis that, without immunity from the government, the proffered testimony would

expose him to a perjury prosecution. The government responded that it would not grant Brooks immunity without a debriefing. On the advice of counsel, Brooks refused to participate in the debriefing process.

The trial court reviewed Brooks's grand jury testimony and engaged in a colloquy with Brooks about his potential privilege. It found that Brooks was at risk for a perjury prosecution if Brooks testified for Wynn in accordance with Wynn's counsel's proffer. The court further stated that the government's demand for a debriefing was not unreasonable or done in bad faith. As a result, the trial court permitted Brooks to claim the Fifth Amendment privilege as to questions about whether Daniel Clark possessed a gun. The trial court found that because the events of the shooting happened quickly and over a "very brief period of time" there would be "no way to parse" through Brooks's prospective testimony so that his claim of privilege would protect him from testifying about some events, but not others. Brooks did not testify for Wynn at trial.

## II.   Discussion

### A.   The Meaning of "Harass" Under D.C. Code § 22-722 (a)(3)(B)

Understandably, all participants in the trial process were focused first and

foremost on the murder charge, but the result seems to have been an obstruction of justice count that received inadequate attention from both the parties and the trial court. As a consequence, we are compelled to reverse the conviction. Starting from an indictment that appears to have been somewhat carelessly drafted, followed by a cursory presentation of the evidence at trial, and continuing through an erroneous jury instruction, we arrive at acceptance of appellant's argument that the evidence was insufficient to support the charge. Although some of the failings rest with appellant, and ordinarily might lead us to deem his arguments waived or, at a minimum, subject to plain-error review, we conclude that the circumstances here call for us to engage in *de novo* review in order to avoid affirming a conviction for conduct that was not a crime. *See, e.g.,* (*Cotey*) *Wynn v. United States*, 48 A.3d 181, 188 (D.C. 2012) (*de novo* review appropriate where "there was no additional evidence the government could have produced to meet their challenge had appellants couched it [properly] in the trial court"). Ultimately, Wynn's claim turns on a question of law and statutory construction. This is a question to be reviewed *de novo*. *Id.* at 187-88; *see also Newby v. United States*, 797 A.2d 1233, 1238-39 (D.C. 2012).

The District of Columbia Code specifies a number of different actions that may constitute obstruction of justice. *See* D.C. Code § 22-722 (a)(1)-(a)(6). Both

parties have briefed the appeal as if the case involves the "harassment" form of obstruction of justice, which provides:

> (a) A person commits the offense of obstruction of justice if that person: . . . (3) *Harasses* another person with the intent to hinder, delay, prevent, or dissuade the person from: (A) Attending or testifying truthfully in an official proceeding; (B) Reporting to a law enforcement officer the commission of, or any information concerning, a criminal offense; (C) Arresting or seeking the arrest of another person in connection with the commission of a criminal offense; or (D) Causing a criminal prosecution or a parole or probation revocation proceeding to be sought or instituted, or assisting in a prosecution or other official proceeding . . . .

D.C. Code § 22-722 (a)(3)(B) (emphasis added). We will take the parties' apparent agreement that this is a "harassment" case at face value and analyze it on that basis.[8] So viewed, we cannot conclude that the government proved conduct

---

[8] The indictment also charged that Wynn obstructed justice by "knowingly threaten[ing]" and "corruptly persuad[ing]" another "with the intent to hinder, delay, prevent and dissuade" the reporting of a crime to a law enforcement officer. However, the government does not defend Wynn's conviction on the basis of any acts that might even arguably constitute threats, and there are none in the record. Although it might have been possible to defend the conviction on the basis of "corrupt persuasion," that action is not an element of the statutory offense charged

(continued…)

constituting "harassment," and we therefore reverse appellant's conviction for obstruction of justice.

In *Woodall v. United States*, 684 A.2d 1258 (D.C. 1996), we approved of a definition of "harass" that included not only threats and physical force, but also the use of "words or actions having a reasonable tendency to badger, disturb, or pester the ordinary person." *Id.* at 1264 (internal quotation marks omitted). This definition has since been integrated into the language of the current pattern Jury Instruction: "'Harass' means to threaten, intimidate, or use physical force against a person or to use any words or actions that have a reasonable tendency to badger, disturb, pester the ordinary person (means seriously alarm, frighten, annoy, or

_____

(…continued)

in the indictment and described in § 22-722 (a)(3)(B); we suspect that the government included the phrase more out of habit than design as it appears in other sections of the obstruction of justice statute but not the one Wynn was charged with violating. *Compare* § 22-722 (a)(3)(B) *with* §§ 22-722 (a)(1) and (a)(2). Equally important, the government does not attempt in its brief on appeal to defend the conviction as a case of "corrupt persuasion," even though Wynn's actions in this case could be viewed as an attempt to "corruptly persuade" Veronica Morris to lie for him and thus might well have been criminal under § 22-722 (a)(2)(A). *See Jones v. United States*, 999 A.2d 917, 920-21 (D.C. 2010) (conviction under § 22-722 (a)(2)(A) upheld where the defendant asked a friend to lie for him immediately following a stabbing at a nightclub). But that avenue of prosecution might be foreclosed in light of (*Cotey*) *Wynn*, 48 A.3d at 187-91 (casting doubt on whether an initial police investigation constitutes an "official proceeding" for purposes of the obstruction of justice statute). Rather than decide that question, we – like the parties – will focus our analysis on the "harassment" language of § 22-722 (a)(3)(B).

torment).” Standardized Criminal Jury Instructions for the District of Columbia, No. 6.101C (5th ed. rev. 2013). Similarly, BLACK'S LAW DICTIONARY (9th ed. 2009), *available at* Westlaw BLACKS, defines “harassment” as “Words, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose.”

These definitions comport with the ordinary usage of the term “harass” and inform our task of statutory construction. “A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.” *Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also Gordon v. United States*, 906 A.2d 882, 884 (D.C. 2006) (“terms used by the legislature . . . will be given the meaning they have in common usage”).

The government’s theory of obstruction of justice was based on Wynn’s request to Veronica Morris, through her daughter Brittany, to provide him with a false alibi. At trial, the defense moved for a judgment of acquittal on the obstruction-of-justice count. The defense argued, in essence, that Veronica Morris was not a witness at the time that Wynn requested Brittany Morris to ask her

mother to lie for him and therefore Wynn could not be guilty of obstructing justice. The trial judge denied the motion, stating that "there is sufficient evidence that Mr. Wynn knew that what he was asking Ms. Veronica Morris to do was to make false statements to the police and perhaps give false testimony." That ruling was correct in light of *Smith v. United States*, 591 A.2d 229, 232 (D.C. 1991) (obstruction-of-justice statute, "by its language covers the broad category of participants, potential or actual, in pending criminal proceedings, and its application extends not only to those who inherently fall within that category by their actual knowledge of material facts but those as well who are by the defendant's own acts brought within that category"), and Wynn does not challenge it on appeal.

When the trial judge instructed the jury, he did not follow the standardized jury instruction for the harassment type of obstruction of justice.[9] Indeed, he removed any reference to the verb "harass" from the instruction and gave the jury no guidance on its definition. Nonetheless, Wynn did not object to the instruction

---

[9] The trial judge's instruction provided: "1. That the defendant corruptly or by threats of force obstructed or impeded, or endeavored to obstruct or impede, a witness or perspective [*sic*] witness, Veronica Morris, from cooperating with law enforcement officers concerning their investigation of a shooting that occurred on July 28th, 2008, in the District of Columbia, and; 2. That the defendant acted with the specific intent to obstruct or impede the due administration of justice."

so we need not consider why the trial judge thought it appropriate under the charge as set forth in the indictment.[10]

Instead, we rest our decision on the conclusion that the "harassment" portion of the obstruction-of-justice statute does not reach Wynn's conduct in this case. While we believe that the government easily met its burden to demonstrate the *mens rea* requirement of the statute – Wynn clearly intended to "hinder, delay, prevent, or dissuade" Veronica Morris from reporting to police information concerning a criminal offense – the same cannot be said with respect to the *actus reus* of the charged crime.

The evidence at trial was that Wynn contacted Veronica Morris through her daughter and asked that she assist him in creating a bogus alibi. Essentially, he asked a girlfriend to help him try to scheme his way out of the major legal predicament in which he found himself. Wynn appeared to have a substantial and fairly long-standing relationship with Veronica. He was staying at her apartment three to four days a week and had access to her bedroom and car. There is no

---

[10] Similarly, Wynn does not challenge the jury instruction on appeal and attacks only the sufficiency of the evidence to prove harassment. Thus, as both parties appeared to agree at oral argument, the issue for us to resolve on appeal is whether Wynn's conduct fit the language of § 22-722 (a)(3)(B).

evidence that his request was unwanted. He only asked once. And the evidence regarding the tenor of his request was that he asked in a non-threatening way in an apparent hope that Veronica might be sympathetic to his dilemma. *Cf. Woodall*, 684 A.2d at 1264 (defendant told witness that unless she kept her "mother f---ing mouth shut" she would end up dead).

The only reaction that Veronica had to the request was one of confusion, not fear or distress or even irritation. Regardless of what synonyms one might use to aid our understanding of the term "harass," see pp. 12-13, *ante*, its meaning is not satisfied under any objective view of what Wynn did. If we were to find that the harassment portion of the obstruction of justice statute extended so far, then the statute might just as well have used the term "asks" instead of "harasses" in § 22-722 (a)(3)(B), making it a crime any time a person *asked* another person (including a close friend or family member) to lie for him or her in an attempt to evade law enforcement. This would make the term "harasses" meaningless.[11] *Tuten v. United States*, 440 A.2d 1008, 1010 (D.C. 1982) ("A statute should not be

---

[11] Certainly, we do not hold that a defendant's action must amount to a "threat" in order to "harass." We readily acknowledge that "harassing" behavior may often be much broader and more subtle than "threatening" behavior. However, we do hold that harassment must amount to more than a one-time, mildly-stated request to someone who might conceivably respond favorably (although we need not reach the question whether there must be more than one "event" in order for the behavior to be harassing).

construed in such a way as to render certain provisions superfluous or insignificant."). Accordingly, we reverse Wynn's conviction for obstruction of justice.

### B. The Trial Court's Denial of the Motion for a Mistrial on All Counts at Wynn's First Trial

We review the decision to grant or deny a mistrial motion for abuse of discretion. *Van Dyke v. United States*, 27 A.3d 1114, 1122 (D.C. 2011). This court makes two inquiries when dealing with allegations of juror coercion. We first examine the "inherent coercive potential of the situation," and then determine whether "the actions of the trial judge . . . exacerbated, alleviated or were neutral with respect to coercive potential." *Harris v. United States*, 622 A.2d 697, 701 (D.C. 1993).

Here, Wynn does not take issue with the *Winters* anti-deadlock instruction that was given to the jury. *Winters v. United States*, 317 A.2d 530 (D.C. 1974) (en banc). Instead, his complaint is as follows: After (1) the *Winters* instruction, (2) the Friday afternoon note from the jury stating that it had not reached a unanimous verdict, and (3) the following jury note intended to inform the judge where the jury stood on a count-by-count basis, the atmosphere in the jury room was at the point

where the trial court's "silence" in the face of the "no unanimous verdict" note had a coercive impact on those jurors holding out for acquittal on the CPWL, FIP, UF, UA, and obstruction of justice counts.

We find Wynn's argument unavailing. It is apparent from the record that the jury struggled extensively with and was divided on the murder count. But there is no evidence to suggest juror isolation with regard to the charges of which Wynn was convicted at the first trial. Instead, the series of jury notes reflects that once the jury was "Winterized" and turned its attention to the counts that were not closely intertwined with the murder count, the jury had a far less difficult time. The judge correctly interpreted the jury's Friday afternoon note relaying that it had not reached a unanimous verdict as a "status update," not a further announcement of deadlock. The plain language of the note did not indicate that the jury was unable to reach a unanimous verdict. The jury was simply stating that it did not have one yet. Moreover, the note that the jury sent revealing its count-by-count position (which the trial court did not read because it incorrectly feared that the note contained numerical splits) indicates that the jury had already reached unanimous verdicts on CPWL, FIP, UF, UA, and obstruction of justice. The court's reactions to these notes were wholly reasonable and no coercive potential could have flowed from them.

Therefore, the record reveals little to no "inherent coercive potential" applicable to the counts for which Wynn was convicted in his first trial. We find no fault with the trial court's actions and no abuse of discretion in denying the motion for a mistrial. Consequently, we reject Wynn's claim.

### C. The Trial Court's Acceptance of Terrence Brooks's Claim of Privilege at Wynn's Second Trial

*Carter v. United States*, 684 A.2d 331 (D.C. 1996) (en banc), established the procedural blueprint for trial courts to follow in an effort to balance the possible tension between a defendant's Sixth Amendment right to compel witness testimony and a witness's Fifth Amendment privilege against self-incrimination. *Carter* first instructs the trial court to determine whether the proffered testimony would be incriminating. *Id.* at 336-38, 344; *see also Butler v. United States*, 890 A.2d 181, 187 (D.C. 2006) (holding that the Fifth Amendment right extends only to specific questions and blanket invocations are discouraged unless the danger of self-incrimination extends to any relevant questions answered by the witness). If the proffered testimony is found to be incriminating and the witness requests immunity prior to testifying, "the defendant must first establish . . . that the proposed testimony is (a) material, (b) clearly exculpatory, (c) non-cumulative, and

(d) unobtainable from any other source." *Carter*, 684 A.2d at 344. The government then may debrief the witness in order to facilitate the determination of whether it should grant the witness immunity. *Id*. at 342, 345. If the witness refuses to be debriefed, it is reasonable for the government to withhold a grant of immunity. *Id*. at 343.

The trial court reviewed Brooks's grand jury testimony and correctly concluded that the proffered testimony, while certainly highly relevant and material to Wynn's defense, would be incriminating to Brooks. If Brooks had testified that he saw Daniel Clark in possession of a gun immediately prior to the shooting, his testimony would have been directly contrary to his statements to the grand jury. Brooks would have been subject to criminal prosecution for perjury. *United States v. Perkins*, 138 F.3d 421, 425 (D.C. Cir. 1998); *United States v. Wilcox*, 450 F.2d 1131, 1141 (5th Cir. 1971) ("[T]he aphorism that one cannot take the Fifth Amendment on the ground that if he testifies he will perjure himself applies only as an excuse for not testifying initially. It does not mean that having once testified, the Fifth Amendment is not available to avoid giving further testimony which might expose the witness to substantial risk of prosecutions growing out of the prior testimony."); *but cf. Salim v. United States*, 480 A.2d 710, 714 (D.C. 1984) (recognizing that a witness who testifies before a grand jury about

incriminating matters without invoking the privilege against self-incrimination generally waives the privilege when he is called to testify at trial on the same subjects).

Furthermore, the court properly engaged in a direct colloquy with Brooks in which Brooks claimed the Fifth Amendment privilege and requested immunity from the government. Brooks declined to participate when the government stated that it required a debriefing of Brooks prior to a grant of immunity. Ultimately, the trial court properly granted Brooks's claim of privilege as to those questions which, if answered, would tend to incriminate him.

Wynn now argues that the trial court erred by failing to undertake a "question by question" examination of Brooks in order to determine whether Brooks could have invoked the privilege on each and every individual question that Brooks could have been asked at trial. The trial court was explicit that it was not granting a "blanket privilege" to Brooks that would extend beyond testimony about whether Daniel Clark was in possession of a weapon prior to the shooting. However, at the same time, the trial court held that there would have been "no way" to practically parse the privileged testimony from the non-privileged

testimony given the compressed timeline of the critical facts of the case. As a result, Brooks did not testify at all.

While the trial court's conclusion that there was no way to conduct this "parsing" is subject to reasonable debate, it is of no consequence to our review. The only fact that Brooks had to offer that conceivably could have had a meaningful effect on the trial was whether or not Daniel Clark possessed a gun before Wynn shot him. Testimony by Brooks about that fact was subject to a clear claim of privilege. Wynn is not entitled to any relief, even assuming a procedural flaw in the trial court's approach. *See Butler*, 890 A.2d at 188-89.

## III. Conclusion

We reverse the judgment as to Wynn's obstruction of justice conviction. In all other respects, the judgment is affirmed. Because the trial court imposed concurrent sentences for the obstruction of justice and weapons offenses, "the reversal of his conviction for obstruction of justice does not require us to remand for resentencing." *Andrews v. United States*, 981 A.2d 571, 578 n.8 (D.C. 2009).

*So ordered.*