*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 12-CF-1499, 12-CF-1500, 12-CF-1501 & 12-CF-1526

DARNELL HAWKINS & MARVIN VERTER, JR., APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-3332-12, CF1-12118-11, CF2-4933-12 & CF1-19790-10)

(Hon. Ronna Lee Beck, Trial Judge)

(Argued March 19, 2014                    Decided July 9, 2015)

*Abram J. Pafford* for appellant Verter.

*Phillip C. Zane* for appellant Hawkins.

*Nicholas Coleman*, Assistant United States Attorney, for appellee. *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Vinet Bryant*, and *SuzAnne C. Nyland*, Assistant United States Attorneys, were on the brief for appellee.

Before WASHINGTON, *Chief Judge*, BECKWITH, *Associate Judge*, and REID, *Senior Judge*.

BECKWITH, *Associate Judge*:  After a joint trial, a jury convicted appellants Darnell Hawkins and Marvin Verter of various charges stemming from the May 2010 shooting death of Dawan Felder in the southeast quadrant of the city.  On appeal, appellants raise several claims of error.  For the reasons explained in this

opinion, we reverse Mr. Hawkins's conviction for obstruction of justice under D.C. Code § 22-722 (a)(3)(B),[1] we reverse Mr. Verter's conviction for obstruction of justice under D.C. Code § 22-722 (a)(6), and we remand to allow the trial court to enter a judgment of acquittal on those counts as well as to effectuate the merger of Mr. Hawkins's remaining obstruction convictions under D.C. Code § 22-722 (a)(2)(A) and (B). We affirm appellants' remaining convictions.

## I. Factual Background

According to the testimony of the government's witnesses, Darnell Hawkins, Marvin Verter, and Dawan Felder were all members of a group called the "Get Money Soldiers" (GMS). They "got money" by selling drugs, assisted in part by several women—including Jerita Campbell, her roommate Dominique Hunter, and their next door neighbor Sharde Wright—who called themselves the "Get Money Bitches." Jerita Campbell testified, in particular, that she sold marijuana out of her apartment to GMS customers.

After a series of incidents that included a customer's complaint about being

---

[1] All D.C. Code citations are to the 2012 Replacement unless otherwise noted.

shorted marijuana in a bag prepared by Dawan Felder, Mr. Verter and Mr. Hawkins began to suspect that Mr. Felder was stealing from the GMS, and Mr. Felder became estranged from the group. At some point, according to Jerita Campbell's testimony, Mr. Hawkins and Mr. Verter told her to alert them if she saw Mr. Felder near her apartment. Several weeks later, Ms. Campbell called Mr. Hawkins and Mr. Verter after seeing Mr. Felder, and they both came to her apartment and spoke with Mr. Felder outside the apartment building. Shortly thereafter, Mr. Hawkins shot Mr. Felder eight times, killing him.

Ms. Campbell testified that she entered the apartment building "crying" after the shooting and went straight into her bedroom in the back of her apartment. Sharde Wright testified that she was next door in Jerita Campbell's and Dominique Hunter's apartment when she heard the shots fired and saw Ms. Campbell run screaming into the apartment building with Mr. Hawkins and Mr. Verter on her heels. According to Ms. Wright, Mr. Hawkins asked for a shirt to replace the distinctive orange one he was wearing, and Mr. Verter gave him a new shirt and threw the orange one away. Mr. Hawkins then left. Ms. Campbell and Dominique Hunter testified that Mr. Verter then came into Ms. Campbell's apartment, gave his car keys to Ms. Campbell, and told her to pick up Mr.

Hawkins from a street nearby.[2]  Ms. Campbell testified that she did so and then drove Mr. Hawkins to a gas station to meet Darrell Matthews, who was the head of GMS.  Mr. Matthews testified that he took Mr. Hawkins to his house, where Mr. Hawkins confessed to him that he killed Mr. Felder because of his disloyalty to the group.

The government also presented evidence that Mr. Hawkins and Mr. Verter used various means to attempt to cover up the shooting.  Mr. Hawkins instructed Ms. Campbell to lie to the police about what happened, and he instructed his girlfriend, Teyarra Butler, to lie to both the police and the grand jury.  Mr. Verter also instructed Ms. Wright to lie to the police and the grand jury and to delete his Facebook page. Ms. Wright also testified that Mr. Verter told her during a visit with him at the D.C. Jail that Ms. Campbell had to be "dealt with" or "gotten out of the way."

The jury convicted Mr. Hawkins of first-degree murder while armed,[3]

---

[2]  Ms. Wright's testimony contradicted this version of events.  According to Ms. Wright, Ms. Campbell came back out of her apartment into the hallway, Mr. Verter told her to give Mr. Hawkins a ride, and Mr. Hawkins followed Ms. Campbell out.  Ms. Wright did not see any keys being exchanged.

[3]  D.C. Code §§ 22-2101, -4502.

possession of a firearm while committing a crime of violence (PFCV),[4] carrying a pistol without a license (CPWL),[5] and three counts of obstruction of justice.[6] The jury acquitted Mr. Verter of first-degree murder but convicted him of accessory after the fact to murder,[7] three counts of obstruction of justice,[8] and tampering with physical evidence.[9] This appeal followed.

## II.    Evidentiary Insufficiency Claims

Both appellants contend that the government presented insufficient evidence to support an obstruction-of-justice conviction, and Mr. Verter also challenges the sufficiency of the evidence for his accessory-after-the-fact conviction. We reverse a conviction on sufficiency grounds if "the evidence,

---

[4] D.C. Code § 22-4504 (b).

[5] D.C. Code § 22-4504 (a).

[6] D.C. Code §§ 22-722 (a)(2)(A), (a)(2)(B), and (a)(3)(B).

[7] D.C. Code §§ 22-1806, -2201.

[8] D.C. Code §§ 22-722 (a)(2)(B) and (a)(6) (two counts). The trial court dismissed one of the § 22-722 (a)(6) counts on the government's motion before sentencing. *See infra* note 17.

[9] D.C. Code § 22-723. The government also dismissed Mr. Verter's gun charges at the close of its case-in-chief.

when viewed in the light most favorable to the government, is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (emphasis omitted) (quoting *Curry v. United States*, 520 A.2d 255, 265 (D.C. 1987)). Juries are "entitled to draw a vast range of reasonable inferences from evidence," but they may not "base a verdict on mere speculation." *Harrison v. United States*, 60 A.3d 1155, 1162-63 (D.C. 2012) (quoting *Rivas*, 783 A.2d at 134). "Slight evidence is not sufficient evidence; a 'mere modicum' cannot 'rationally support a conviction beyond a reasonable doubt.'" *In re D.P.*, 996 A.2d 1286, 1288 (D.C. 2010) (quoting *Rivas*, 783 A.2d at 134).

## A. Mr. Verter's Obstruction-of-Justice Conviction

Marvin Verter challenges the sufficiency of the evidence supporting his obstruction-of-justice conviction under D.C. Code § 22-722 (a)(6)—specifically, the fourth count of the March 2012 indictment alleging that he "corruptly and by threats of force endeavored to obstruct or impede" the grand jury proceedings by making a statement to Sharde Wright about Jerita Campbell once it became clear Ms. Campbell would be a government witness. Sharde Wright testified that she visited Mr. Verter at the D.C. Jail, where he was being held on an unrelated

charge, and when the two were discussing this case, Mr. Verter said that Jerita Campbell had to be "dealt with." The prosecutor asked Ms. Wright if she remembered "the specific words that he used," to which she responded that Mr. Verter said, "She has to be gotten out the way or something." "We have to get her out of the way?" the prosecutor asked. Over Mr. Verter's unsuccessful objection to the leading question rephrasing Mr. Verter's statement, Ms. Wright responded, "Yeah." Ms. Wright testified that Mr. Verter made these statements about Ms. Campbell because "she was talking" and "[s]he was the main witness."

At trial, the prosecutor indicated in her opening statement that in support of this obstruction charge, the government would show that Marvin Verter "actually threatened the life of Jerita Campbell because she was a witness against them." At the end of trial, after Sharde Wright testified about her conversation with Mr. Verter, the government suggested that Mr. Verter violated the obstruction statute by directing *Ms. Wright* to silence Ms. Campbell, stating in its closing argument that "[l]ater [Ms. Wright] goes to visit [Mr. Verter] at the jail, and what does he say? 'We got to get rid of Jerita because she's talking.' That's obstruction of justice." And likewise in rebuttal: "What you have is obstruction for [Mr. Verter]

telling Sharde that we have to get rid of Jerita because she's talking."[10]

The trial court instructed the jury on six distinct obstruction charges—three involving Marvin Verter.[11] With respect to the count at issue here—"obstruction of judicial proceedings against Darnell Hawkins and Marvin Verter"—the court, using the standard jury instruction, told the jury that it could find Mr. Verter guilty on this count if the government persuaded it beyond a reasonable doubt that he "obstructed or impeded or endeavored to obstruct or impede the due administration of justice in a proceeding in a court of the District of Columbia" and that he "did so with the intent to undermine the integrity of the pending proceeding." The court added that "[t]he government need not prove that Marvin Verter successfully obstructed or impeded the due administration of justice." Neither the court's instruction nor the verdict form clarified for the jury which factual allegations were

---

[10] In a colloquy with the trial court, the prosecutor confirmed the trial court's understanding that this "final obstruction of justice charge" was based solely on Sharde Wright's testimony about what Mr. Verter told her at the jail that day.

[11] The court noted at the outset that Darnell Hawkins and Marvin Verter were "each charged with multiple counts of obstructing justice," that "[t]he elements of obstructing justice vary based on the alleged conduct underlying each charge," and that the court would therefore "instruct [the jury] separately on each charge of obstructing justice."

intended to support which of the many obstruction charges.

Immediately after the jury returned its verdict of guilt on this obstruction offense, the trial court ordered the government to brief the question whether Mr. Verter's statement constituted obstruction of justice—that is, whether Mr. Verter's statement, "without more, without any overt act, without any activity other than the bald statement 'We've got to rid [sic] of Jerita' is enough to make out an obstruction count." In a memorandum in support of the conviction, the government backed away from the theory presented at trial, arguing instead that the conviction was valid based upon a theory the jury never heard—that the evidence "was sufficient for a jury to infer that Verter endeavored to obstruct justice by intimidating Sharde Wright from testifying against him" when he made a threatening statement about Ms. Campbell in her presence. Mr. Verter filed an opposition requesting a judgment of acquittal on this count. The trial court agreed with the government, ruling orally at Mr. Verter's sentencing that the evidence was sufficient to uphold the obstruction count under § 22-722 (a)(6) on the ground that the jury could reasonably interpret Mr. Verter's statement as a "threat[]" toward Ms. Campbell that "could have the effect of intimidating Ms. Wright, another potential Government witness."

On appeal, the government no longer appears to be pressing—at least not explicitly—the revamped theory that persuaded the trial court that the obstruction conviction had been justly secured. It asserts in its brief simply that Mr. Verter's statement "was sufficient evidence from which the jury could infer that Verter acted with the requisite intent to undermine the integrity of the grand jury proceedings."[12]

Under either of the government's theories, the evidence was insufficient to support Marvin Verter's conviction under D.C. Code § 22-722 (a)(6).[13] With

---

[12] The government's citation to *McBride v. United States*, 393 A.2d 123 (D.C. 1978), arguably suggests that the government is defending the conviction on the ground argued to the trial court post-verdict but not to the jury—namely, that Mr. Verter obstructed justice by seeking to scare Ms. Wright into not testifying before the grand jury. *See id.* at 130-31 (holding that a jury could infer that a defendant intended to obstruct justice without having directly addressed or threatened the witnesses he was attempting to intimidate). The government never affirmatively says so, however, and it devotes its argument primarily to rebutting Mr. Verter's contentions that his statement about "deal[ing with]" Ms. Campbell was open to innocent interpretations and that the record lacked evidence that Ms. Wright acted on or intended to act on Mr. Verter's statement.

[13] Mr. Verter contends, as an initial matter, that the trial court erred in admitting this statement because the prosecutor asked an improper leading question that altered the meaning of Ms. Wright's words by changing them from "[s]he has to be gotten out the way" to the active-voice statement, "[w]e have to get her out of the way." Though an improper leading question can in some circumstances impair the defendant's right to a fair trial, *see Crawford v. United States*, 932 A.2d 1147, 1162 (D.C. 2007); *Bailey v. United States*, 831 A.2d 973,

(continued…)

respect to the theory that Mr. Verter obstructed justice by seeking to persuade Sharde Wright to "deal with" Jerita Campbell or "get her out of the way,"[14] the record contains insufficient evidence that this statement actually instructed her to do so and that Mr. Verter therefore "endeavored to obstruct or impede" the proceedings within the meaning of the statute.[15] D.C. Code § 22-722 (a)(6). Citing *Irving v. United States*, 673 A.2d 1284, 1289 (D.C. 1996), the government argues that overt conduct is not required to support an obstruction conviction. While it is true that "the term 'endeavor' does not require success or even an overt attempt," the defendant must still make "any effort or essay to accomplish the evil purpose that the [statute] was enacted to prevent," *id.* at 1289 (quoting *United States v. Russell*, 255 U.S. 138, 143 (1921)), and "[i]dle talk without additional

---

(…continued)
984 (D.C. 2003), we need not decide whether the trial court abused its discretion by overruling Mr. Verter's objection because even with Ms. Wright's response to the leading question, the record lacks sufficient evidence that Mr. Verter was guilty of obstructing justice.

[14] The government amplified this theory at oral argument, contending that Mr. Verter's statement constituted obstruction because it instructed Ms. Wright to undertake efforts to silence Ms. Campbell—to "formulate a plan of action."

[15] D.C. Code 22-722 (a)(6) provides that a person obstructs justice when he "[c]orruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding."

evidence of the active intent to deter testimony is beyond the purview of the [obstruction] statute." *Id.* The trial court's own concerns in the wake of the jury's verdict highlight the failing in the government's contention that what the trial court referred to as Mr. Verter's "bald statement" to Ms. Wright was sufficient to establish obstruction beyond a reasonable doubt.

While a clear instruction to a witness not to testify can no doubt constitute an endeavor to prevent testimony if it is made with the requisite "corrupt" intent, *see Brown v. United States*, 89 A.3d 98, 104 (D.C. 2014) (defendant's instruction to a witness to "keep the code"—that is, to not testify—was obstruction), the record must contain sufficient evidence that the defendant's statement is actually an instruction. In *Griffin v. United States*, 861 A.2d 610 (D.C. 2004), where Mr. Griffin told a witness to "come down to his court date" and "tell his lawyer everything [she] told the police" or something "'bad' or 'life-threatening' would happen," we rejected the government's contention that the witness had "made prior false statements to the police and hence would lie in his behalf at his preliminary hearing" and instead deemed it "simply too much of a stretch" to conclude that Mr. Griffin was instructing the witness to lie at the hearing. *Id.* at 614-15. "Jurors would have to engage in speculation and the drawing of several inferences which

would not comport with the reasonable doubt standard required for a criminal conviction." *Id.* at 615. The record here likewise lacks sufficient evidence to support the government's contention that Mr. Verter was instructing Ms. Wright to silence Ms. Campbell. As Mr. Verter argues in his brief, the government presented no evidence "to suggest that Wright acted on this statement, that she intended to act on it, that Mr. Verter intended her to act on it, that the statement was ever communicated directly or indirectly to Ms. Campbell, or that Mr. Verter intended it to be communicated to Ms. Campbell"—anything that would bolster the government's assertion that Mr. Verter's statement suggested that Ms. Wright should take action or induce others to take action.

If, on the other hand, the theory of obstruction in this case is that Mr. Verter sought to scare Ms. Wright out of testifying by expressing the need to "deal with" another government witness, the government's evidence was likewise insufficient. Setting aside that neither the questioning of Sharde Wright nor the parties' arguments alerted the jurors that they should contemplate the charge in this way[16] and that the jury instruction on the charge added no clarity, the evidence

---

[16] The prosecutor did not ask Ms. Wright, for example, whether she was intimidated by Mr. Verter's statement or whether it affected her appearance before the grand jury.

supporting this theory fails to establish that Mr. Verter intended to obstruct or impede the grand jury proceedings that resulted in Mr. Hawkins's and Mr. Verter's indictments.

The government acknowledges that obstruction of justice is a specific intent crime requiring intent to impair the proceeding. *See Crutchfield v. United States*, 779 A.2d 307, 325 (D.C. 2001). Thus the "effect" of intimidating Ms. Wright— which was the focus of the trial court's post-verdict ruling sustaining the conviction—cannot, by itself, be sufficient to establish obstruction.

And we cannot glean from this record sufficient evidence that Mr. Verter intended his statement about Ms. Campbell to intimidate Ms. Wright not to testify. It is true that "[e]xpressions of intent to kill certain witnesses, made within earshot of other witnesses, could have a tendency to influence or intimidate those who heard the statements." *McBride v. United States*, 393 A.2d 123, 130 (D.C. 1978); *see also Castillo-Campos v. United States*, 987 A.2d 476, 492 (D.C. 2010) (holding that the record contained sufficient evidence of obstruction when appellant intended to "intimidat[e] anyone who heard his statement (or heard of his statement)"). In *McBride v. United States*, for example, the appellant was convicted of obstruction when he directed his brother to "retrieve[]" three

eyewitnesses from the scene of the crime—three women with no apparent relation to the defendants—and bring them to him, where he commented to "no one in particular" that two other eyewitnesses "knew him, and would have to be 'knocked off.'" 393 A.3d at 125. We held there that the jury could reasonably conclude that the defendant intended to threaten the three witnesses with death by informing them "that [two] others who saw the offense would have to be 'knocked off.'" *Id*. at 131. In the present case, Ms. Wright was not a stranger brought to Mr. Verter, but an intimate friend voluntarily visiting him in jail. The jury had no evidence from which to infer that Ms. Wright was not a willing participant in the conversation, and the record lacks the crucial facts from which the jury could reasonably infer an intent to intimidate Ms. Wright by talking about Ms. Campbell in her presence.

Our decision in *Castillo-Campos v. United States*, *supra*, is similarly distinguishable. There, the appellant stated that he "was not going to let" a government witness snitch during a discussion in which a co-appellant "responded that he would put a bullet in [the witness's] head or in the head of anyone who snitched." 987 A.2d at 492. We concluded that "given the context," where the co-appellant explicitly threatened "anyone" who snitched, there was sufficient

evidence for a jury to conclude that the appellant also intended to intimidate "anyone" else who heard or heard of his statement. Here, neither the context surrounding Mr. Verter's statement in this case nor Mr. Verter's statement itself revealed anything resembling an intent to threaten "anyone" who might testify adversely. If anything, the circumstances indicate that Mr. Verter already assumed Ms. Wright was in his corner.[17] Ms. Wright testified that she had been sexually involved with Mr. Verter, that even after the shooting she got his name tattooed on her breast, and that at the time of trial there was no "bad blood" or "hard feeling" between the two of them.[18]

---

[17] In fact, Ms. Wright had already lied to police at his request, resulting in another of Mr. Verter's obstruction convictions. That conviction was later dismissed on the government's motion after this court's decision in *(Cotey) Wynn v. United States*, 48 A.3d 181 (D.C. 2012), which was issued after the jury's verdict but prior to sentencing, and which held that conduct interfering with the actions of police officers responding to the scene of a crime—in that case, hiding guns and holding a door closed to keep police from entering—did not amount to obstructing "the due administration of justice in any official proceeding" for purposes of D.C. Code § 22-722 (a)(6). *Id.* at 184-85, 191.

[18] While Ms. Wright said that on the night of the shooting she was scared— even "afraid for [her] life"—and that she "didn't know" whether someone from GMS might "do something to [her] and [her] three children," she testified that afterward she continued her relationship with Mr. Verter, that she visited him at the jail, and that she "really cared about him," "thought she was in love," and hoped to eventually have an exclusive relationship with him. She also testified that she was

(continued…)

Moreover, unlike the clear connotation of murder in the threat to have witnesses "knocked off" in *McBride*, 393 A.2d at 130-31, or shot in the head in *Campos-Castillo*, 987 A.2d at 492, Mr. Verter's reference to "dealing with" Ms. Campbell or "getting" her "out of the way" was not as obviously a threat to harm her, as there are many nonviolent (though not necessarily legal) ways to "deal with" a witness—for example, by figuring out ways to discredit her expected testimony, pleading with her not to testify, or tricking her into leaving town during trial. *See Harrison v. United States*, 60 A.3d 1155, 1165 (D.C. 2012) (statement asking if "they ever [took] care of" the witness was too ambiguous to demonstrate intent to prevent testimony). Thus the jury could not reasonably infer that Mr. Verter's statement about Jerita Campbell was intended to intimidate Sharde Wright to prevent her from testifying. Under either of the government's theories of obstruction, then, the evidence was insufficient to prove beyond a reasonable doubt that Marvin Verter "endeavored to obstruct or impede" the grand jury proceedings.

---

(…continued)

not afraid of Darnell Hawkins in the wake of the shooting, and that Mr. Hawkins accompanied her to get the tattoo.

## B. Mr. Verter's Accessory-After-the-Fact Conviction

Mr. Verter also challenges the sufficiency of the evidence supporting his conviction for being an accessory after the fact to murder under D.C. Code §§ 22-1806 and 22-2101. He first claims that the government presented insufficient evidence that he acted with "specific intent [to] prevent the principal's arrest, trial, or punishment." *Jones v. United States*, 716 A.2d 160, 165-66 (D.C. 1998). Mr. Verter's conviction on this count stems from the testimony at trial that after Darnell Hawkins left the scene following the shooting, Mr. Verter came into Jerita Campbell's apartment, gave her his truck keys, and told her to pick up Mr. Hawkins nearby. From that evidence, the government asserts, the jury could reasonably infer that Mr. Verter intentionally provided Mr. Hawkins with the means to help him flee the area. *See Clark v. United States*, 418 A.2d 1059, 1061 (D.C. 1980) ("Under some circumstances, merely allowing a person who has committed an offense to ride in one's automobile away from the scene of a crime . . . is a sufficient act" to sustain an accessory-after-the-fact conviction. (internal quotation marks, brackets, and citation omitted)).

Mr. Verter points instead to testimony of Sharde Wright that contradicted Jerita Campbell's and Dominique Hunter's version of events. Ms. Wright

testified that right after the shooting, she was standing in the doorway of her apartment with Ms. Campbell, Mr. Verter, and Mr. Hawkins when Mr. Hawkins demanded a ride. These facts, in Mr. Verter's view, support "an equally reasonable inference" that he arranged a ride for Mr. Hawkins to protect himself and others by "put[ting] as much distance" as possible between them and Mr. Hawkins—that is, to "save his own skin," *see Outlaw v. United States*, 632 A.2d 408, 413 (D.C. 1993)—rather than to help Mr. Hawkins escape.

The night's events may have unfolded as Mr. Verter contends. But viewing the facts in the light most favorable to the government, we cannot say the jury's decision to credit Ms. Campbell's testimony instead was unreasonable. Ms. Campbell testified that Mr. Hawkins had already left the apartment building and was on a nearby street when Mr. Verter gave her his car keys to pick up Mr. Hawkins—facts tending to undermine Mr. Verter's assertion that he gave Ms. Campbell his keys to get Mr. Hawkins away from him. The jury could also consider that Mr. Verter, a fellow member of the Get Money Solders, had a motive to help Mr. Hawkins, and that Mr. Verter's own illegal activity would likely come to light if Mr. Hawkins were apprehended for the drug-related killing of Mr. Felder. These facts, along with evidence that Mr. Verter knew beforehand

that the shooting would occur, provide sufficient grounds for a reasonable jury to conclude that Mr. Verter intended to aid Mr. Hawkins's escape.[19]

Mr. Verter contends in the alternative that the record contains insufficient evidence that Mr. Felder died before Mr. Verter aided Mr. Hawkins. A defendant cannot be convicted of accessory after the fact to murder on the basis of actions taken while the decedent is still alive. *Little v. United States*, 709 A.2d 708, 714 (D.C. 1998). The record suggests that Mr. Verter provided aid within a minute or two of the shots fired by Mr. Hawkins. Notwithstanding the lack of medical testimony establishing how long Mr. Felder lived after being shot, a jury could reasonably infer that Mr. Felder died before Mr. Verter provided aid to Mr. Hawkins based on evidence that Mr. Hawkins shot Mr. Felder eight times, including four times in the face, and that one shot was "rapidly fatal." *Cf. Jones*, 716 A.2d at 164 (noting that the jury could reasonably infer instantaneous death

---

[19] Mr. Verter argues that the jury rejected the government's theory of the incident when it acquitted him of aiding and abetting murder, and that with this "evidentiary backdrop" a juror could not find intent to aid beyond a reasonable doubt. Inconsistent verdicts do not mandate reversal, however. *Jones*, 716 A.2d at 164. We consider all the evidence in the record in the light most favorable to the government, *Rivas*, 783 A.2d at 134, and "[t]hat the jury acquitted appellant of [other charges] does not negate the sufficiency of the evidence as to the conviction for being an accessory after the fact." *Jones*, 716 A.2d at 164.

when the decedent was shot seven times at close range, three times to the head).

The evidence was sufficient to support this conviction.

## C. Mr. Hawkins's Obstruction-of-Justice Conviction

Darnell Hawkins also challenges the sufficiency of the evidence supporting

one of his obstruction-of-justice convictions—the one resting on evidence that Mr.

Hawkins and Jerita Campbell exchanged several phone calls after she gave him a

ride in the wake of Mr. Felder's killing, and that during at least one of those calls,

he told her not to tell anybody what happened. Ms. Campbell's testimony about

what Mr. Hawkins said to her about talking was this: "He was saying I—as I was

talking to him on the phone as he called me, he was just saying don't tell nobody

what—you know what I'm saying, what happened. They was saying if the police

come, tell the police that I didn't—that I didn't know nothing."

Under D.C. Code § 22-722 (a)(3)(B), an individual obstructs justice when

he "[h]arasses another person with the intent to hinder, delay, prevent or dissuade

the person from . . . [r]eporting to a law enforcement officer the commission of, or

any information concerning, a criminal offense." "Harass" means "to threaten,

intimidate, or use physical force against a person or to use any words or actions

that have a reasonable tendency to badger, disturb, [or] pester the ordinary person

([i.e., to] seriously alarm, frighten, annoy, or torment)." *(Ronald) Wynn v. United States*, 80 A.3d 211, 217-18 (D.C. 2013) (quoting Criminal Jury Instructions for the District of Columbia, No. 6.101C (5th ed. rev. 2013) and citing *Woodall v. United States*, 684 A.2d 1258 (D.C. 1996)). This language is nearly verbatim to the instruction the court gave the jury on this count.

At trial, the government did not underscore for the jury what particular evidence demonstrated that Mr. Hawkins "harasse[d]" Ms. Campbell for purposes of the obstruction statute when he made the statement in question. The prosecutor's only mention of this obstruction count in her closing argument was her comment that when Mr. Hawkins was "instructing" Ms. Campbell "that she need not talk to the police, that she better not say anything," that "[t]hat, ladies and gentlemen, is obstruction of justice. All day long." In her rebuttal argument, the prosecutor repeated this characterization of the obstruction count: "What you have is obstruction of justice with [Mr. Hawkins] telling Jerita Don't you say anything to the police. Don't you tell them what happened."

D.C. Code § 22-722 (a)(3)(B) does not "mak[e] it a crime any time a person *ask*[*s*] another person (including a close friend or family member) to lie for him or her in an attempt to evade law enforcement." *Wynn*, 80 A.3d at 219 (emphasis in

original). Ms. Campbell's description of what Mr. Hawkins said to her is insufficient in itself to support the jury's determination that Mr. Hawkins harassed her for purposes of this subsection of the obstruction statute. *See id.* (stating, where the evidence showed that Wynn asked a friend to assist him in creating a bogus alibi, that "he only asked once" and "[t]here is no evidence that his request was unwanted").

The government points to other evidence in the record—besides that which the prosecutor highlighted for the jury at trial—that it contends permitted a reasonable juror to conclude that Mr. Hawkins had harassed Ms. Campbell with the intent to keep her from reporting the offense to police. That evidence includes the log of telephone calls between Mr. Hawkins and Ms. Campbell after she dropped him off that night and some references in Ms. Campbell's testimony to her fear of being labeled a "snitch" and her fear that others in the GMS group—though not Mr. Hawkins—had a key to her apartment.

The evidence regarding the exchange of phone calls and Ms. Campbell's fear of being labeled a snitch is too sparse and too speculative a basis to support a conclusion beyond a reasonable doubt that Mr. Hawkins obstructed justice under

§ 22-722 (a)(3)(B) by harassing Ms. Campbell.[20] With respect to the phone calls, while Ms. Campbell testified that Mr. Hawkins and Darrell Matthews "kept calling [her]," none of her descriptions of the calls indicated they were badgering or harassing in nature. Ms. Campbell agreed with the characterization of those calls as "back-and-forth traffic on the phone" and made clear that on more than one occasion she initiated the call to Mr. Hawkins. Nor does the record establish how many times Mr. Hawkins and Ms. Campbell actually spoke to each other, as opposed to placing unanswered calls and leaving messages, and the indications in the record that Ms. Campbell consistently called Mr. Hawkins back suggest that she missed his call in the first place.[21] Significantly, the record contains no evidence about what Mr. Hawkins and Ms. Campbell said to each other beyond Mr. Hawkins's initial inquiry about where Ms. Campbell was going that night and

---

[20] The government stated in its brief that there were "dozens" of phone calls between the two and relied on this fact—and more specifically, on "how intently Hawkins focused on Campbell in the hours immediately after the murder"—to support its contention that a reasonable person in Ms. Campbell's position would have felt harassed by Mr. Hawkins's instructions. In a letter to the court before oral argument, the government corrected its estimation of the number of calls, stating that Mr. Hawkins made ten calls, as opposed to almost fifty calls, to Ms. Campbell during this time period. As we note *infra*, the jury learned almost nothing about the content of these calls between Mr. Hawkins and Ms. Campbell.

[21] Indeed, our review of the call logs suggests that four of Mr. Hawkins's ten calls were routed to voicemail and another lasted only two seconds.

his instruction not to tell anybody what happened. Ms. Campbell did not say, for example, whether Mr. Hawkins repeated the statement about not talking to the police or just made it once. The bits of the phone conversations Ms. Campbell did describe—such as her testimony that she called Mr. Hawkins back "'[b]ecause they called me to ask me where was I going and I told them I was going . . . with Demarco"—have a matter-of-fact rather than a badgering or harassing quality to them. On this record, the call log and Ms. Campbell's testimony about the calls do not support the government's portrayal of the calls as unrelenting harassment.

Ms. Campbell's testimony about her fear—specifically, her fear of being labeled a "snitch" and her fear that various members of the GMS had keys to her apartment—also fails to support an inference that Mr. Hawkins was obstructing justice under § 22-722 (a)(3)(B) when he told her not to tell the police what happened. In the government's view, the fact that Ms. Campbell actually lied to the police is evidence of harassment, but her testimony that she was afraid to tell the truth because "[p]eople get killed" when they get "label[ed] as snitches" is unconnected to Mr. Hawkins's phone calls that night. Ms. Campbell's testimony instead suggests that her fears stemmed from a "stop snitching" culture that existed in GMS even without somebody telling her not to speak to the police. The

government did not show that her fears had any link to Mr. Hawkins's instruction to her to lie, and Ms. Campbell's testimony in this regard cannot substitute for evidence of harassment that is otherwise lacking in the record. While the government is not required to negate every theory of innocence, *Brown v. United States*, 89 A.3d 98, 102 (D.C. 2014) (citation omitted), the verdict also cannot rest on speculation or unwarranted inferences. *Rivas*, 783 A.2d at 134.

### III.   Jury Instructions

Mr. Hawkins argues that his obstruction convictions under D.C. Code §§ 22-722 (a)(2)(A) and (B)—those involving statements he made to his girlfriend Teyarra Butler to influence her testimony about the incident—should be vacated because the jury instructions omitted an element of the offense. Specifically, he contends that the instructions omitted the statutory mens rea requirement that the defendant act "corruptly," improperly replacing it with the phrase "with the intent to undermine the integrity of the proceeding."

The relevant statutory provisions punish one who:

> (2) Knowingly uses intimidation or physical force, threatens or corruptly persuades another person, or by threatening letter or communication, endeavors to influence, intimidate, or impede a witness or officer in any official proceeding, with intent to:

(A) Influence, delay, or prevent the truthful testimony of the person in an official proceeding; [or]

(B) Cause or induce the person to withhold truthful testimony or a record, document, or other object from an official proceeding;

D.C. Code § 22-722 (a) (2012 Repl.). With respect to the count alleging a violation of subsection (A), the trial court instructed the jury that it must find the following elements beyond a reasonable doubt:

> [O]ne: Teyarra Butler was a witness in a proceeding in the court of the District of Columbia. Two: Darnell Hawkins knew or believed that Teyarra Butler was a witness. Three: Darnell Hawkins[,] with the intent to undermine the integrity of the proceeding[,] persuaded or tried to persuade Teyarra Butler; and four: Darnell Hawkins did so with the intent to influence, delay or prevent Teyarra Butler's truthful testimony in that proceeding. The government need not prove that Darnell Hawkins successfully influenced, delayed or prevented Teyarra Butler's truthful testimony in that proceeding.

The court gave the same instruction to the jury for the subsection (B) offense except for element four, which required the jury to find that Darnell Hawkins "did so with the intent to cause or induce Teyarra Butler to withhold truthful testimony from the proceeding."

To support a conviction, due process requires the government to establish proof beyond a reasonable doubt of every element of the crime charged. *In re Winship*, 397 U.S. 358, 364 (1970). The government argues that because Mr. Hawkins did not object to the jury instructions at trial, we must review his contention that the instructions omitted an element for plain error only. *See, e.g.*, *Beaner v. United States*, 845 A.2d 525, 539 (D.C. 2004). Mr. Hawkins asks the court to make a de novo assessment of the instructions for the same reasons we addressed de novo an unpreserved legal challenge to an obstruction-of-justice conviction in *(Ronald) Wynn v. United States*, 80 A.3d 211 (D.C. 2013)—that is, that the murder charge in that case dominated the trial and the obstruction charge "received inadequate attention from both the parties and the trial court." *Id*. at 216-17; *cf. Appleton v. United States*, 983 A.2d 970, 977 (D.C. 2009) ("Where the question of whether a jury instruction was proper is a legal question, as it is here, we review the instruction de novo."). Because we discern no error in the court's instructions under either standard of review, we need not decide whether to follow *Wynn*'s lead in this case.

This court recently discussed the definition of "corruptly" in *Brown v. United States*, 89 A.3d 98 (D.C. 2014), where we noted that in *Arthur Andersen*

*LLP v. United States*, 544 U.S. 696 (2005), the Supreme Court "analyzed the term 'corruptly'" in the federal obstruction-of-justice statute by "distilling its connotations into the word 'wrongdoing.'" *Brown*, 89 A.3d at 104; *see Arthur Andersen*, 544 U.S. at 705 (suggesting that the word "corruptly" is normally associated with "wrongful, immoral, depraved, or evil" acts); *see also Riley v. United States*, 647 A.2d 1165, 1169 n.11 (D.C. 1994) (citing to the Black's Law Dictionary definition of "corruptly" as "a wrongful design to acquire some pecuniary or other advantage") (citing BLACK'S LAW DICTIONARY 345 (6th ed. 1990)).  In another recent case, *Smith v. United States*, 68 A.3d 729, 742 (D.C. 2013), we implicitly equated "corruptly" with "intent to undermine the integrity of the pending investigation"[22] when listing the elements of obstruction under subsection (a)(6).  That language is similar to the definition employed by several federal appellate courts—that to act "corruptly" means to act "knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice." *See, e.g.*, *United States v. Kay*, 513 F.3d 432, 454 (5th Cir. 2007); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013)

---

[22] A pending investigation is just one of several events that qualifies as an "official proceeding" within the meaning of the statute.  *See* D.C. Code § 22-721 (4).

(defining "corruptly" as "with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct the" proceeding) (quoting *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011)). The language in *Smith* also mirrors the jury instruction provided in this case—"with the intent to undermine the integrity of the proceeding."

In contending that the jury instruction here did not require the jury to find that Mr. Hawkins acted with the requisite level of intent, Mr. Hawkins relies heavily upon the Supreme Court's holding in *Arthur Andersen*, which reversed the petitioner's conviction based on inadequate jury instructions. 544 U.S. at 708. Somewhat similar to this case, the Fifth Circuit's pattern jury instruction there defined "corruptly" as "knowingly and dishonestly, with the specific intent to subvert or undermine the integrity of a proceeding." 544 U.S. at 706 (internal quotation marks omitted). But the problem in *Arthur Andersen* was not the pattern jury instruction. The Supreme Court instead disapproved of three changes the trial court had made to the pattern instruction by adding the word "impede" to "subvert" and "undermine," by removing the word "dishonestly," and by inserting a statement that "even if [petitioner] honestly and sincerely believed that its conduct was lawful, you may find [petitioner] guilty." *Id.* Taken together, these

changes "diluted the meaning of 'corruptly' so that it covered innocent conduct." *Id.*

The jury instruction in Mr. Hawkins's case did not suffer from such flaws. Although adding the words "knowingly and dishonestly" and "with an improper purpose" would bring our case law into accord with several federal circuits, the word "undermine" itself "convey[s] the requisite consciousness of wrongdoing," *id.*, and thus the instructions here required the jury to find beyond a reasonable doubt that Mr. Hawkins acted corruptly.

Relying on *Arthur Andersen*'s statement that it is not "corrupt" to persuade a spouse "not to disclose marital confidences," 544 U.S. at 704 (citing *Trammel v. United States*, 445 U.S. 40 (1980)), Mr. Hawkins further asserts that the instruction here was deficient because it allowed a conviction for "asking one's intimate partner to lie to the police," which in his view is also "not necessarily corrupt." Yet *Arthur Andersen*'s citation to *Trammel* signals that the Court was referring to spousal privilege, which is a limited exception to the general rule that "the public . . . has a right to every [person]'s evidence." *Trammel*, 445 U.S. at 50 (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)). Mr. Hawkins and his then-girlfriend Ms. Butler cannot invoke this privilege, which in the District of

Columbia applies only to married spouses and domestic partners, D.C. Code § 14-306. *Arthur Andersen* also did not condone persuading a spouse to *lie*, which undermines a court proceeding far more than withholding relevant evidence pursuant to an evidentiary privilege.

We conclude that the trial court did not err in instructing the jury regarding the elements of the obstruction counts against Mr. Hawkins under D.C. Code §§ 22-722 (a)(2)(A) and (B).

## IV.   Merger

Mr. Hawkins makes three arguments that various convictions should merge. Merger doctrine stems from the Fifth Amendment Double Jeopardy Clause, which prohibits multiple punishments for the same offense. *Wilson v. United States*, 528 A.2d 876, 879 (D.C. 1987) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). "[A] single transaction may result in distinct offenses under separate statutes without violating the Double Jeopardy Clause." *Id.* (citing *Albernaz v. United States*, 450 U.S. 333, 344-45 n.3 (1981)). Under the *Blockburger* test, offenses merge "unless each contains at least one element which the other does not." *Id.* (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

Mr. Hawkins first argues that his sentencing enhancement for "committing crime while armed," D.C. Code § 22-4502, merges with his conviction for PFCV, D.C. Code § 22-4504 (b). We rejected this claim, however, in *Thomas v. United States*, 602 A.2d 647 (D.C. 1992), and we cannot overrule the prior decision of another division of this Court. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). Mr. Hawkins also argues that his conviction for CPWL, D.C. Code § 22-4504 (a), merges with his armed weapon enhancement and PFCV charge. Section 22-4504 (a) has recently been amended, *see* D.C. Law 19-170 (2012), but at the time of trial in June 2012, that crime required proof that the pistol was "without a license issued pursuant to District of Columbia law." D.C. Code § 22-4504 (a) (2001). Neither of his other charges required proof of non-licensure, and each required additional elements (for instance, murder or commission of a crime) not present in the CPWL charge. These convictions therefore do not merge.

Lastly, Mr. Hawkins argues that his obstruction convictions under D.C. Code §§ 22-722 (a)(2)(A) and (a)(2)(B) should merge, as both convictions were predicated on his instructions to Teyarra Butler to testify falsely before the grand jury. As charged here, subsection (A) makes it a crime to "[i]nfluence . . . the truthful testimony of the person in an official proceeding," while under subsection

(B) it is unlawful to "[c]ause or induce the person to withhold truthful testimony . . . from an official proceeding." Besides an unpersuasive contention that Mr. Hawkins waived his merger argument,[23] the government's sole argument opposing merger is its statement that Mr. Hawkins's "claim is without merit," followed by a citation to *Brown v. United States*, 766 A.2d 530, 541 (D.C. 2001). *Brown* is inapposite, however, as the relevant portion of that opinion discusses the difference between obstructing truthful as opposed to false testimony, and the opinion actually demonstrates that each defendant was convicted of only one count of obstruction for conduct that allegedly violated either subsection (a)(2)(A) or (B). *Id.* at 541, 551. Nor do we believe Mr. Hawkins's two convictions are distinct because his instruction to Ms. Butler caused her both (1) to falsely testify

---

[23] The government contends that Mr. Hawkins waived his merger argument because he "does not offer any substantive argument" and "cites no case law to support his general assertion that Sections 722 (a)(2)(A) and (B) of the obstruction statute 'merge.'" Yet the two sentences Mr. Hawkins devotes to the issue succinctly state both the relief he is requesting—the merger of these two offenses—and the reasons such relief is warranted. Merger is required, Mr. Hawkins argues, "because it is difficult to see a difference between (1) influencing truthful testimony, which, to constitute an offense surely includes not giving, and therefore, withholding truthful testimony, and (2) withholding truthful testimony," and because even "[i]f the two are subtly different, the first includes the second because to give something other than truthful testimony is to withhold truthful testimony." With or without a case citation, we disagree with the government's characterization of this discussion as devoid of substantive argument.

that Mr. Hawkins denied committing the murder and (2) to not testify that Mr. Hawkins had confessed to committing the murder. While one can withhold the truth *without* making a false statement, telling a lie necessarily includes withholding the truth too, so a person who "influences" truthful testimony under subsection (a)(2)(A) by instructing a person to lie will violate subsection (B) as well. Therefore, under a straightforward *Blockburger* analysis, the elements of subsection (a)(2)(A) as charged here completely encompass subsection (a)(2)(B), and these two convictions merge.

## V.    Severance

In his final challenge to his convictions, Mr. Hawkins argues that the trial court erred by not severing his trial with Mr. Verter pursuant to Super. Ct. Crim. R. 14. He contends, in particular, that severance was necessary because Mr. Verter's counsel acted as a "second prosecutor" by establishing that Mr. Hawkins was in possession of his cell phone at the time of the murder[24] and by "invent[ing] a motive for the crime that no witness had suggested."

---

[24] The homicide detective that interviewed and arrested Mr. Hawkins had testified at trial that he knew, based on GPS data, that Mr. Hawkins's phone was in the area of the shooting at the time that it occurred.

Mr. Hawkins did not request severance prior to trial as required by Super. Ct. Crim. R. 12 (b)(5). Nor did he object at trial. We therefore review the trial court's failure to sever the joint trial for plain error. *Taylor v. United States*, 603 A.2d 451, 456 n.17 (D.C. 1992); *cf. Hammond v. United States*, 880 A.2d 1066, 1089 (D.C. 2005), *abrogated in part on other grounds by Davis v. Washington*, 547 U.S. 813 (2006) (plain error review when appellant did not contemporaneously object to joinder based on events occurring during trial).

The fact that counsel for one defendant effectively acts as a "second prosecutor" is generally insufficient to constitute prejudice requiring severance. *Roy v. United States*, 871 A.2d 498, 505 (D.C. 2005); *Mitchell v. United States*, 569 A.2d 177, 182 (D.C. 1990). Here, where there was substantial evidence of Mr. Hawkins's guilt independent of the facts and alleged motive posited by Mr. Verter's counsel, we find no plain error. *Id.* at 181-82; *Dancy v. United States*, 745 A.2d 259, 266 (D.C. 2000). Mr. Hawkins cannot show that any error was "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial," *Taylor*, 603 A.2d at 456 n.17 (quoting *Watts v. United States*, 362 A.2d 706, 709 (D.C. 1976) (en banc)).

## VI.   Conclusion

For the foregoing reasons, we reverse Mr. Hawkins's conviction for obstruction of justice under D.C. Code § 22-722 (a)(3)(B) and Mr. Verter's conviction for obstruction of justice under D.C. Code § 22-722 (a)(6), and we remand for entry of a judgment of acquittal on those counts. We also remand for merger of Mr. Hawkins's obstruction convictions under D.C. § 22-722 (a)(2)(A) and (B). We affirm all remaining convictions.

*So ordered.*